# FEDERAL POWER COMMISSION *v.* TEXACO INC. ET AL.

No. 72–1490.   Argued February 19, 1974—Decided June 10, 1974*

---

*Together with No. 72–1491, *Dougherty, Executor, et al.* v. *Texaco Inc. et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which all Members joined except STEWART, J., who took no part in the consideration or decision of the cases.

*Mark L. Evans* argued the cause for petitioner in No. 72–1490. With him on the briefs were *Solicitor General Bork, Leo E. Forquer,* and *George W. McHenry, Jr. Ben F. Vaughan III* argued the cause for petitioners in No. 72–1491. With him on the briefs was *William Terry Bray.*

*Christopher T. Boland* and *Peter H. Schiff* argued the cause for respondents in both cases. With *Mr. Boland* on the brief for respondent Interstate Natural Gas Association of America were *Jerome J. McGrath* and *Robert G. Hardy.* With *Mr. Schiff* on the brief for respondent Public Service Commission of the State of New York was *Richard A. Solomon. Kirk W. Weinert* and *C. Fielding Early, Jr.,* filed a brief for respondent Texaco Inc. *Kenneth Heady, John L. Williford, Charles E. McGee, John T. Ketcham,* and *Robert J. Haggerty* filed a brief for respondent Phillips Petroleum Co. *Melvin Richter* and *L. F. Cadenhead* filed a brief for respondent Tennessee Gas Pipeline Co., a Division of Tenneco Inc. *Edward H. Forgotson* filed a brief for respondent Forgotson.[†]

MR. JUSTICE WHITE delivered the opinion of the Court.

This litigation involves the validity of Order No. 428 of the Federal Power Commission, 45 F. P. C. 454 (1971), which provides a blanket certificate procedure for small producers of natural gas, and relieves them of almost all filing requirements. The rates of small producers would no longer be directly regulated but would be subjected to indirect regulation through the review of purchased gas costs of the pipelines and large producers to whom these

---

[†]Briefs of *amici curiae* urging reversal in both cases were filed by *L. Dan Jones* for the Independent Petroleum Association of America, and by *J. Evans Atwell* and *Lynn R. Coleman* for the Small Producers Group.

small producers sell. The Court of Appeals, with one judge dissenting, set aside the order, 154 U. S. App. D. C. 168, 474 F. 2d 416 (1972), concluding that the Commission's order amounted to "deregulation" of small producers and was unauthorized by the Natural Gas Act (the Act), 52 Stat. 821, 15 U. S. C. § 717 *et seq.* Because the validity of the order is of obvious importance, we granted the petition for a writ of certiorari filed by the Commission in No. 72–1490 and by the estate of Mrs. James R. Dougherty, an intervenor in the Court of Appeals, in No. 72–1491. 414 U. S. 817 (1973).

I

On July 23, 1970, the Federal Power Commission issued a notice of proposed rulemaking "propos[ing] prospectively to exempt from regulation under the Natural Gas Act all existing and all future jurisdictional sales made by small producers . . . ." 35 Fed. Reg. 12,220 (1970). Following the filing of comments and informal conferences, the Commission, noting that one of its important responsibilities was "to assure maintenance of an adequate gas supply for the interstate market," issued Order No. 428, aimed at encouraging "small producers [1] to increase their exploratory efforts which are so important to the discovery of new sources of gas . . . to facilitate the entry of the small producer into the interstate market and to stimulate competition among producers to sell gas in interstate commerce." [2]  The small

---

[1] A "small producer" was defined as an independent producer, not affiliated with a natural gas pipeline company, whose total jurisdictional sales on a nationwide basis, together with sales of affiliated producers, did not exceed 10,000,000 Mcf at 14.65 psia during any calendar year. New small-producer sales included any sale made pursuant to a contract dated after March 18, 1971.

[2] The Commission found that small producers produce about 10% of the gas purchased by pipelines, excluding all pipeline-to-pipeline

producer was to be assured that "when he enters into a new contract for the interstate sale of gas, the provisions of his contract will not be subject to change. We also want to relieve the small producer of the expenses and burdens relating to regulatory matters." 45 F. P. C., at 455. Accordingly, the order provided for a nationwide blanket certificate for small producers and relieved them, with some exceptions, from all filing requirements under the Act. Unlike large producers, subject to Commission-fixed ceilings on rates charged, the small producers could sell gas at the price the market would bear, even though in excess of maximum rates set for producers in pertinent area rate proceedings. Furthermore, they would have "no refund obligations with respect to increased rates, if any, collected for sales regulated hereunder to pipelines . . . ." *Id.*, at 457.

The order nevertheless asserted that the "action taken here in our view does not constitute deregulation of sales by small producers," *id.*, at 455, and that the Commission would continue to regulate such sales in the course of regulating the rates of pipelines and large producers to whom the small producers sell their gas. Pipelines purchasing from small producers at prices in excess of existing ceilings were to be permitted to file "tracking increases" in their rates, but those rates would be subject to refund "with respect to new small producer sales, but only as to that part of the rate which is unreasonably high considering appropriate comparisons with highest contract prices for sales by large producers or the prevailing market price for intrastate sales in the same producing area." *Id.*, at 457. The issue would be resolved either in pipeline rate cases, a proceeding limited to the tracking increase, or in

---

sales. It appears, however, that they also account for 80% of the natural gas exploration in this country.

certificate cases. "The Commission shall consider all relevant factors." *Id.,* at 458. Review of tracking increases by pipelines was not anticipated as to existing contracts with small producers; the order authorized small producers to increase their rates under these contracts, terms permitting.

Large producers buying from small producers would be permitted tracking increases to the extent authorized by their contracts and without refund obligation "as long as the price differential is consistent with prevailing price differentials in the area and as long as the small producer prices for new gas are not unreasonably high, considering appropriate comparisons with highest contract prices by large producers or the prevailing market price for intrastate sales in the same producing area." *Id.,* at 456. To the extent that they reflected small-producer prices in excess of that standard, large-producer tracking increases would be subject to refund.

The Commission finally asserted that "[w]e intend to review the prices established in new contracts or contract amendments relating to sales by small producers to assure the reasonableness of the rates charged by such producers pursuant to the action we are taking herein. In the event we determine that this approach is inimical to the interests of consumers, we shall take further action to protect the consumers." *Id.,* at 459. The Commission apparently remained free to institute separate proceedings under § 5 (a) of the Act, 15 U. S. C. § 717d (a), to reduce the producer's rates prospectively.

The Commission also made clear that small producers remain subject to the requirements of § 7 (b) of the Act, 15 U. S. C. § 717f (b), with respect to the abandonment of jurisdictional sales, including those sales dealt with in the order. The order also limited the use of indefinite price escalation clauses in small-producer contracts and

excluded from the reach of the order small-producer sales made from reserves transferred by large producers.[3]

The Court of Appeals set aside the Commission order, holding that under the statute *all* natural gas sold in interstate commerce must carry just and reasonable rates and that even if indirect regulation was permissible under the statute, Order No. 428 was infirm because nothing in it satisfied the Commission's "duty to insure that all rates are 'just and reasonable.'" 154 U. S. App. D. C., at 173, 474 F. 2d, at 421. Instead, the order was thought merely to call for rates that were not unreasonably high as compared with the highest contract prices for large-producer sales or the prevailing market price in the intrastate market—"factors which [the Commission] does not regulate or which derive solely from market forces." *Ibid.* Nor could the court accept the possible argument that market forces themselves would produce just and reasonable rates, particularly when it understood the Commission itself to take the position that the just-and-reasonable standard was in no event mandatory. The Court of Appeals accordingly set aside the Commission's order.

## II

The Commission does not contend in this Court that the Act permits it to exempt small-producer rates from regulation or to regulate those rates by any criterion less demanding than the just-and-reasonable standard mandated by §§ 4 and 5 of the Act, 15 U. S. C. §§ 717c and 717d. Its major propositions are, first, that Order No. 428, when properly understood, provides for just and

---

[3] Subsequently, the Commission issued two supplemental orders, Order No. 428–A, 45 F. P. C. 548, revising the annual statement requirements for small producers and Order No. 428–B, 46 F. P. C. 47, which denied applications for rehearing and modified Order No. 428 in respects that need not be mentioned here.

reasonable rates but through the means of indirect, rather than direct, regulation; and, second, that the Act does not forbid this kind of indirect regulation. Respondents, on the other hand, contend that the duty imposed by the Act to provide just and reasonable rates cannot be satisfied by indirect regulation and that Order No. 428 in any event abandons the just-and-reasonable standard with respect to small-producer rates.

We face first the issue as to the validity of indirect regulation of small-producer rates: on the assumption that Order No. 428 allows pipelines and large producers to reflect in their rates only just and reasonable charges for gas purchased from small producers, is the order valid? We hold that it is, for we see nothing in the Act which requires the Commission to fix the rates chargeable by small producers by orders directly addressed to them or which proscribes the kind of indirect regulation undertaken here.

The Act directs that all producer rates be just and reasonable but it does not specify the means by which that regulatory prescription is to be attained. That every rate of every natural gas company must be just and reasonable does not require that the cost of each company be ascertained and its rates fixed with respect to its own costs. Although for a time following *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672 (1954), the Commission proceeded to regulate rates company by company, there was soon a shift to the technique of setting area rates based on composite cost considerations. We sustained this mode of rate regulation.

In *Wisconsin* v. *FPC,* 373 U. S. 294, 309 (1963), the Court affirmed the Commission's decision to abandon the individual cost-of-service method of fixing rates and to substitute area ratemaking. The Court said:

"To declare that a particular method of rate regulation is so sanctified as to make it highly unlikely that

> any other method could be sustained would be wholly out of keeping with this Court's consistent and clearly articulated approach to the question of the Commission's power to regulate rates. It has repeatedly been stated that no single method need be followed by the Commission in considering the justness and reasonableness of rates . . . ."

This was wholly consistent with the Court's prior views, see *FPC* v. *Natural Gas Pipeline Co.*, 315 U. S. 575 (1942); *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591 (1944); *Colorado Interstate Gas Co.* v. *FPC*, 324 U. S. 581 (1945), and reaffirmed the principle which had been clearly stated in the *Hope* case: "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." 320 U. S., at 602.

The principles of these prior cases were recognized and applied in the *Permian Basin Area Rate Cases*, 390 U. S. 747 (1968), where we sustained a two-tier system of rates for natural gas producers. In the course of doing so, we recognized that encouraging the exploration for and development of new sources of natural gas was one of the aims of the Act and one of the functions of the Commission. The performance of this role obviously involved the rate structure and implied a broad discretion for the Commission. The Court summarized the principles controlling the judicial review of Commission orders in terms very pertinent here:

> "The Act was intended to create, through the exercise of the national power over interstate commerce, 'an agency for regulating the wholesale distribution to public service companies of natural gas moving interstate'; *Illinois Gas Co.* v. *Public Service Co.*, 314 U. S. 498, 506; it was for this purpose expected to 'balanc[e] . . . the investor and the consumer

interests.' *FPC* v. *Hope Natural Gas Co.* [320 U. S.],
at 603. This Court has repeatedly held that the
width of administrative authority must be measured
in part by the purposes for which it was conferred;
see, *e. g., Piedmont & Northern R. Co.* v. *Comm'n,*
286 U. S. 299; *Phelps Dodge Corp.* v. *Labor Board,*
313 U. S. 177, 193–194; *National Broadcasting Co.*
v. *United States,* 319 U. S. 190; *American Trucking
Assns.* v. *United States,* 344 U. S. 298, 311. Surely
the Commission's broad responsibilities therefore
demand a generous construction of its statutory
authority. [Footnote omitted.]

"Such a construction is consistent with the view
of administrative rate making uniformly taken by
this Court. The Court has said that the 'legislative
discretion implied in the rate making power neces-
sarily extends to the entire legislative process,
embracing the method used in reaching the legisla-
tive determination as well as that determination
itself.' *Los Angeles Gas Co.* v. *Railroad Comm'n,*
289 U. S. 287, 304. And see *San Diego Land &
Town Co.* v. *Jasper,* 189 U. S. 439, 446. It follows
that rate-making agencies are not bound to the
service of any single regulatory formula; they are
permitted, unless their statutory authority otherwise
plainly indicates, 'to make the pragmatic adjust-
ments which may be called for by particular circum-
stances.' *FPC* v. *Natural Gas Pipeline Co.* [315
U. S.], at 586." 390 U. S., at 776–777.

It followed that Commission action taken in the pursuit
of a legitimate statutory goal enjoyed the presumption
of validity, *id.*, at 767, and that he who would upset the
rate order under the Act carries " 'the heavy burden of
making a convincing showing that it is invalid because
it is unjust and unreasonable in its consequences.' " *Ibid.*

Accepting these views of our role as a court sitting in review, we cannot at this point say that the Commission has exceeded its powers by instituting a regime of indirect regulation of small-producer rates. Surely it is not fatal to Order No. 428 that it does not, as an initial matter, consider the costs of each company and the reasonableness of its rates. Nor is the order vulnerable because there will be one level of just and reasonable rates for small producers and another for large producers. As previously noted, the Court approved two sets of just and reasonable rates in the *Permian Basin* cases, the justification being the necessity to stimulate exploration for and the development of new supplies of natural gas. *Id.*, at 796–797.

Indirect regulation through the mechanism of controlling large-producer costs will not merely recreate the situation which the Court in the *Phillips* case found to be inconsistent with the Natural Gas Act. In the pre-*Phillips* era, although asserting the right to pass on the prudentiality of various items of the pipelines' costs, the Commission did not purport to regulate the rates of producers with the aim of keeping them within just and reasonable limits, as the Commission now asserts it is doing under Order No. 428.

It is argued that permitting the small producers initially to charge what the market will bear and relying on later regulation of pipeline rates to protect the consumer is contrary to *Atlantic Refining Co.* v. *Public Service Comm'n*, 360 U. S. 378 (1959) (*CATCO*). But pipelines and large producers must file with the Commission their new contracts with the small producers, and their rates will be subject to suspension and refund within the limits set out in Order No. 428. As the Court noted in *FPC* v. *Sunray DX Oil Co.*, 391 U. S. 9, 26 (1968), the basic assumption which must have underlain the Court's *CATCO* decision was "that the purchasing pipe-

line, whose cost of purchase is a current operating expense which the pipeline is entitled to pass on to its customers as part of its rates, lacks sufficient incentive to bargain prices down." Here, on the other hand, the incentive is provided—pipeline rates are subject to refund to the extent that the purchased gas cost component of their rates is excessive.

This leads to the contention of the pipelines and the large producers that the scheme of indirect regulation envisioned by Order No. 428 unfairly subjects them to the risk of later determination that their gas costs are unjust and unreasonable and to the obligation to make refunds which they cannot in turn recover from the small producers whose rates have been found too high.[4] But those whose rates are regulated characteristically bear the burden and the risk of justifying their rates and their costs. Rate regulation unavoidably limits profits as well as income. "The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid." *FPC* v. *Hope Natural Gas Co.*, 320 U. S., at 601. All that is protected against, in a constitutional sense, is

---

[4] The large producers also contend that they are put at a disadvantage by the Commission's order because their contracts may not permit them to pass on the increased costs of gas purchased from small producers, whereas the pipelines will be in a position to do so. This is, however, a function of the producers' contracts, and the Commission has no authority, absent a finding that the existing contract rate "is so low as to have an adverse effect on the public interest," to permit large producers or pipelines to raise their rates in excess of the maximum authorized in their contracts, *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348, 355 (1956); *United Gas Co.* v. *Mobile Gas Corp.*, 350 U. S. 332 (1956). We think other claims of the large producers, as to unfair treatment or discrimination, are equally ill-founded.

that the rates fixed by the Commission be higher than a confiscatory level. *FPC* v. *Natural Gas Pipeline Co.*, 315 U. S., at 585. In the context of the Act's rate regulation, whether any rate is confiscatory, or for that matter "just and reasonable," can only be judged by "the result reached, not the method employed." *FPC* v. *Hope Natural Gas Co.*, *supra*, at 602. In the *Permian Basin Area Rate Cases*, 390 U. S., at 769, we stated a truism of rate regulation: "Regulation may, consistently with the Constitution limit stringently the return recovered on investment, for investors' interests provide only one of the variables in the constitutional calculus of reasonableness."

Here, requiring pipelines and the large producers to assume the risk in bargaining for reasonable prices from small producers is within the Commission's discretion in working out the balance of the interests necessarily involved. The consumer would be protected from current excessive rates, but at the expense of the pipeline, rather than the producer, who is engaged in necessary exploratory activity, thus serving the public interest in getting greater gas production but at just and reasonable rates. Under such circumstances, it is surely not an abuse of the discretion the Commission retains under § 4 (e) of the Act, see *Permian Basin Area Rate Cases*, *supra*, at 826–827, to refrain from imposing a refund obligation on the small producers.

Any broadside assertion that indirect regulation will be confiscatory is premature. The consequences of indirect regulation can only be viewed in the entirety of the rate of return allowed on investment, and this effect will be unknown until the Commission has applied its scheme in individual cases over a period of time. Moreover, the "regulation of producer prices is avowedly still experimental," *id.*, at 772, and Order No. 428 asserts the

Commission's intention to keep the experiment under close review. The Commission claims and is entitled to no license to be arbitrary or capricious in disallowing purchased gas costs of large producers and pipelines. The Commission may not exceed its authority under the Act; its orders are subject to judicial review; and reviewing courts must determine whether Commission orders, issued pursuant to indirect regulation, are supported by substantial evidence and whether it is rational to expect them "to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risk they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." *Id.*, at 792.

If, in the course of the necessary bargaining with small producers, the large producers and the pipelines are given no guidance whatsoever as to what the standards of the Commission may be, the risk of incurring unrefundable expenses that may later be disallowed is considerably enhanced. The scope of this possible difficulty is measured by the standards, or lack of them, by which the Commission will review the purchased gas costs of the large producers and the pipelines. As Order No. 428 reveals, the Commission is surely aware of the problem, and we would expect additional attention to be given this question in the course of the remand proceedings which, as explained in Part III, we think are necessary here.[5]

---

[5] The New York Public Service Commission also questions whether it is administratively feasible for the FPC, on review of individual pipelines' costs, to make sure rates are just and reasonable, claiming that this would be a return with a vengeance to the administrative morass which led to the adoption of area rates for producers in the first instance. This claim is also premature in light of possible regulatory approaches the FPC may take on remand.

## III

We turn now to whether Order No. 428 is invalid for failure to comply with the Act's requirement that the sale price for gas sold in interstate commerce be just and reasonable. The Court of Appeals rejected what it apparently understood was "the Commission's basic contention all along . . . that the 'just and reasonable' standard was not mandatory and that the FPC can simply choose not to regulate rates." 154 U. S. App. D. C., at 175, 474 F. 2d, at 422. Whatever the position of the Commission heretofore has been, it wisely does not challenge that aspect of the Court of Appeals judgment. Sections 4 and 5 of the Act require that all gas rates be just and reasonable; and the Court held in *Phillips* that this very prescription applies to the rates of all gas producers. The Commission may have great discretion as to how to insure just and reasonable rates, but it is plain enough to us that the Act does not empower it to exempt small-producer rates from compliance with that standard.

Section 16, 15 U. S. C. § 717*o,* upon which the Commission relies, is not to the contrary. It authorizes the Commission to perform any and all acts and to issue any and all rules and regulations "as it may find necessary or appropriate to carry out the provisions of this Act"; and "[f]or the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters." But § 16 obviously does not vest authority in the Commission to set unjust and unreasonable rates, even for small producers. It does not authorize the Commission to set at naught an explicit provision of the Act. No producer is exempt from §§ 4 and 5. Neither the *Permian Basin Area Rate Cases* nor *FPC* v. *Louisiana Power & Light Co.,* 406 U. S. 621 (1972),

on which the Government relies, suggests or holds that § 16 permits the Commission to ignore the specific mandates of those sections.[6]

The Court of Appeals also read Order No. 428 as failing to provide a mechanism for insuring that small-producer rates will be just and reasonable. In its view, the order provided a pure market standard for the approval of the purchased gas costs of large producers and pipelines, a standard which fell short of the requirements of the Act. Accordingly, it set aside the order.

The Commission does not assert here that it is free under the Act to equate just and reasonable rates with the prices for gas prevailing in the market place. Its major remaining contention is that the Court of Appeals misread Order No. 428 and that the order, properly understood, contemplates a scheme of indirect regulation that would assure just and reasonable small-producer rates for natural gas and that would judge small-producer rates not only by market factors but by all the relevant considerations necessary to arrive at the considered judgment contemplated by the Act. For present purposes, then, the Commission accepts the Court of Appeals' construction of the Act; but insists that the order is consistent with the statute as so construed.

In this posture of the case, we think it clear that Order No. 428 cannot stand in its present form and that the cases should be remanded for further proceedings before the Commission. We have studied the order with care, and we cannot accept the construction of it that the Commission now presses upon us. At the very least, the order is so ambiguous that it falls short of that standard

---

[6] The Commission's position is not advanced by *FPC* v. *Hunt,* 376 U. S. 515, 527 (1964). The Court in that case merely questioned whether exemption might prove, after study, to be an available alternative.

of clarity that administrative orders must exhibit. The Commission was bound to exercise its discretion within the limits of the standards expressed by the Act; and "for the courts to determine whether the agency *has* done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' " *Burlington Truck Lines* v. *United States,* 371 U. S. 156, 167–168 (1962), quoting in part from *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 197 (1941). We shall indicate briefly our basis for this conclusion.

In the first place, Order No. 428 does not expressly mention the just-and-reasonable standard. It comes no closer than to subject pipeline rates to reduction and refund "only as to that part of the rate which is *unreasonably* high considering appropriate comparisons with highest contract prices for sales by large producers or the prevailing market price for intrastate sales . . . ." 45 F. P. C., at 457. (Emphasis added.) The order took a very similar approach to the tracking increases by large producers. Moreover, under the order, contractually authorized increases in rates for flowing gas under existing contracts could be automatically passed through by the pipelines and would not be subject to examination under the standard proposed by the order with respect to new sales by small producers. There was no finding that these contemplated increased rates for flowing gas would be just and reasonable. The Commission merely asserts in its brief here that it was familiar with the existing contracts and must have considered the rates reserved to be acceptable under the Act.

It is true that pipeline and large-producer costs for new small-producer gas were not to be "unreasonable" but the implication appears to be that reasonableness would be judged by the standard of the marketplace. It

is also true that the Commission asserted that it was not deregulating small-producer rates, that the Commission "shall consider all relevant factors" in determining whether proposed rates were consistent with the "public convenience and necessity," and that the Commission intended to review new contract prices charged by small producers "to assure . . . the reasonableness of the rates charged by such producers pursuant to the action we are taking herein." But these generalities do not supply the requisite clarity to the order or convince us that it should be sustained.

Had the order unambiguously provided what the Commission now asserts it was intended to provide,[7] we would have a far different case to decide. But as it is, we cannot "accept appellate counsel's *post hoc* rationalizations for agency action"; for an agency's order must be upheld, if at all, "on the same basis articulated in the order by the agency itself." *Burlington Truck Lines,* 371 U. S., at 168–169; *SEC* v. *Chenery Corp.,* 332 U. S. 194, 196 (1947).

## IV

For the purposes of the proceedings that may occur on remand, we should also stress that in our view the prevailing price in the marketplace cannot be the final measure of "just and reasonable" rates mandated by the Act. It is abundantly clear from the history of the Act and from the events that prompted its adoption that Congress considered that the natural gas industry was heavily concentrated and that monopolistic forces were

---

[7] The Commission, in its brief, has indicated that the standard will not be limited to comparisons with appropriate market prices, but will include (1) producer's costs, (2) the pipeline's need for gas, (3) the availability of other gas supplies, (4) the amount of gas dedicated under the contract, and (5) the rates of other recent small-producer sales previously approved for flowthrough.

distorting the market price for natural gas.[8]   Hence, the necessity for regulation and hence the statement in *Sunray DX*, 391 U. S., at 25, that if contract prices for gas were set at the market price, this

> "would necessarily be based on a belief that the current contract prices in an area approximate closely the 'true' market price—the just and reasonable rate.   Although there is doubtless some relationship, and some economists have urged that it is intimate, such a belief would contradict the basic assumption that has caused natural gas production to be subjected to regulation . . . ."   (Footnote omitted.)

---

[8] As appears from § 1 (a) of the Act, 15 U. S. C. § 717 (a), the legislation stemmed from the 1935 Report of the Federal Trade Commission.   S. Doc. No. 92, pt. 84–A, 70th Cong., 1st Sess. (published 1936).   That report concluded that there was heavy concentration both in the production and distribution of natural gas.   "The 4 largest producer groups account for about 72 percent of the output of natural gas produced by 32 holding company groups in 1930."   *Id.,* at 589.   The heavy concentration of pipeline ownership "accentuates whatever control the pipeline interests have of the available gas supply."   *Id.,* at 590.   The Commission concluded, on the basis of its detailed investigation of the industry, that "[t]he prime characteristic of the situation described is that of a steadily developing concert of interests dominating the producing, transporting, and distributing branches of the industry."   *Id.,* at 600.   The heart of the problem was at the pipeline end, since the concentration of ownership there allowed the concert of interests "to determine the amount of natural gas which may be marketed by fixing the amount which may be transported.   That in turn gives it power to say how much shall be produced."   *Ibid.*   Based upon these findings, the Commission singled out as "Specific Evils Existing in the Natural-Gas Industry" both the "[u]nregulated monopolistic control of certain natural-gas production areas" and the "[u]nregulated control of pipeline transmission and of wholesale distribution."   *Id.,* at 615.   It concluded that regulation, at least of pipelines, see *id.,* at 616, was required.

In subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could not have assumed that "just and reasonable" rates could conclusively be determined by reference to market price. Our holding in *Phillips* implies just the opposite. This does not mean that the market price of gas would never, in an individual case, coincide with just and reasonable rates or not be a relevant consideration in the setting of area rates, see *Permian Basin Area Rate Cases*, 390 U. S., at 793–795; it may certainly be taken into account along with other factors, *Southern Louisiana Area Rate Cases*, 428 F. 2d 407, 441 (CA5), cert. denied *sub nom. Associated Gas Distributors* v. *Austral Oil Co.*, 400 U. S. 950 (1970). It does require, however, the conclusion that Congress rejected the identity between the "true" and the "actual" market price.

The Court is not unresponsive to the special needs of small producers who play a critical role in exploratory efforts in the natural gas industry and ameliorating the supply shortage. The requirements of the Act, however, do not distinguish between small and large producers with respect to just and reasonable rates. Even if the effect of increased small-producer prices would make a small dent in the consumer's pocket, when compared with the rates charged by the large producers, the Act makes unlawful all rates which are not just and reasonable, and does not say a little unlawfulness is permitted. Moreover, there is no finding in the Commission's order as to the actual impact the projected market price increases would have on consumer expenditures for gas, and the Commission is previously on record in its *Permian* decision, as stating: "[T]he impact of small producer prices on consumers is by no means *de minimis* on an area basis, and is of great impact in some situations." 34 F. P. C. 159, 235 (1965).

## V

In concluding that the Commission lacks the authority to place exclusive reliance on market prices, we bow to our perception of legislative intent. It may be, as some economists have persuasively argued,[9] that the assumptions of the 1930's about the competitive structure of the natural gas industry, if true then, are no longer true today. It may also be that control of prices in this industry, in a time of shortage, if such there be, is counterproductive to the interests of the consumer in increasing the production of natural gas. It is not the Court's role, however, to overturn congressional assumptions embedded into the framework of regulation established by the Act. This is a proper task for the Legislature where the public interest may be considered from the multifaceted points of view of the representational process.

Attempts have been made in the past to exempt producers from the coverage of the Act, but these attempts have been unsuccessful. The Court realized as much in the *Phillips* case. 347 U. S., at 685, and n. 14. In 1950, Congress had passed a bill, H. R. 1758, 81st Cong., 2d Sess., to exempt gas producers from the Act, but President Truman vetoed the bill stating that "there is a clear possibility that competition will not be effective, at least in some cases, in holding prices to reasonable levels. Accordingly, to remove the authority to regulate, as this bill would do, does not seem to me to be wise public

---

[9] See C. Hawkins, Structure of the Natural Gas Producing Industry, and P. MacAvoy, The Regulation-Induced Shortage of Natural Gas, in Regulation of the Natural Gas Producing Industry 137–191 (K. Brown ed. 1972). See also Statement of John N. Nassikas, Chairman, Federal Power Commission, Hearing on the Natural Gas Industry before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., 43–72 (1973).

policy." The President made this judgment despite the arguments that imposition of price control would discourage exploration and development of new wells. Public Papers of the Presidents, Harry S. Truman, 1950, p. 257 (1965). For the Court to step outside its role in construing this statute, and insert itself into the debate on economics and the public interest, would be an unwarranted intrusion into the legislative forum where the debate again rages on the question of deregulation of natural gas producers.

We do, however, make clear that under the present Act the Commission is free to engage in indirect regulation of small producers by reviewing pipeline costs of purchased gas, providing that it insures that the rates paid by pipelines, and ultimately borne by the consumer, are just and reasonable. It may be, as some of the respondents suggest, that ensuring just and reasonable rates by means of indirect regulation will not be administratively feasible, but this is a matter for the Commission to consider.

We agree with the Court of Appeals that the order of the Commission must be set aside; but for reasons previously stated, we vacate the judgment of the Court of Appeals and remand the cases to that court with instructions to remand the cases to the Commission for further proceedings consistent with this opinion.

*Vacated and remanded.*

Mr. Justice Stewart took no part in the consideration or decision of these cases.