**ELIZABETHTOWN GAS COMPANY,
Petitioner,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

**Columbia Gas Transmission Corporation, Washington Gas Light Company, Transcontinental Gas Pipe Line Corporation, The City of Danville, Virginia, The Process Gas Consumers Group, et al., South Jersey Gas Company, South Carolina Pipeline Corporation, Sun Company, Inc., ANR Pipeline Company, The Brooklyn Union Gas Company, Piedmont Natural Gas Company, Inc., Dakota Gasification Company, and Transco Municipal Group, et al., Intervenors.**

Nos. 92–1030, 92–1059.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 23, 1993.

Decided Dec. 17, 1993.

John T. Miller, Jr. for petitioner Elizabeth-town Gas Co.

Edward J. Grenier, Jr., with whom Sterling H. Smith and Roger D. Williams were on the brief for petitioners Process Gas Consumers Group, American Iron and Steel Institute, and Georgia Industrial Group.

Timm L. Abendroth and Eric L. Christensen, Attys., FERC, with whom William S. Scherman, General Counsel, and Jerome M. Feit, Solicitor, FERC, were on the brief for respondent.

Michael J. Fremuth, with whom Anthony J. Ivancovich, Michael W. Hall, Mary Jane Reynolds, Randall R. Conklin, David A. Glenn, John K. Keane, Jr., Telemac N. Chryssikos, and Robert B. Evans were on the joint brief for intervenors Transcontinental Gas Pipe Line Corp., Dakota Gasification Co., The Brooklyn Union Gas Co., and Washington Gas Light Co.

Thomas J. Eastment and Alan W. Tomme entered appearances for intervenor Union Pacific Resources Co.

James F. Bowe, Jr. and O. Julia Weller entered appearances for intervenors Virginia Natural Gas, Inc., and Long Island Lighting Co.

Cheryl L. Jones and Barbara K. Heffernan entered appearances for intervenor Delmarva Power & Light Co.

Michael J. Thompson and Wade H. Hargrove entered appearances for intervenor Public Service Company of N.C., Inc., Michael J. Thompson and Donald W. McCoy entered appearances for intervenor North Carolina Natural Gas Corp.

Steven A. Taube, entered an appearance for intervenor Philadelphia Gas Works.

F. Nan Wagoner entered an appearance for intervenor Texas Eastern Transmission Corp.

James H. Byrd, James R. Choukas-Bradley, L. Clifford Adams, Jr. entered appearances for intervenors Transco Municipal Group and the Municipal Gas Authority of Georgia.

Kenneth D. Brown entered an appearance for intervenor Atlanta Gas Light Co.

R. Brian Corcoran entered an appearance for intervenor Owens–Corning Fiberglas Corp.

Thomas J. Eastment and Charles F. Hosmer entered appearances for intervenor ARCO Oil and Gas Co., Thomas J. Eastment and David R. Stevenson entered appearances for intervenor Chevron U.S.A. Production Co., Thomas J. Eastment and J. Paul Douglas entered appearances for intervenor Conoco, Inc., Thomas J. Eastment and C. Roger Hoffman entered appearances for intervenor Exxon Corp., Thomas J. Eastment and John S. Carr entered appearances for intervenor Mobil Natural Gas, Inc., Thomas J. Eastment and Michael L. Pate entered appearances for intervenor OXY USA, Inc., Thomas J. Eastment entered an appearance for intervenor Shell Gas Trading Co., Thomas J. Eastment and Ralph J. Pearson, Jr. entered appearances for intervenor Texaco, Inc. and Texaco Marketing, Inc.

R.J. Clark entered an appearance for intervenor UGI Corp.

Marye L. Wright, Giles D.H. Snyder, and Stephen J. Small entered appearances for intervenor Columbia Gas Transmission Corp.

Robert B. Evans, John K. Keane, Jr., and Telemac N. Chryssikos entered appearances for Washington Gas Light Co.

Michael J. Fremuth, Anthony J. Ivancovich, David A. Glenn, and Randall R. Conklin entered appearances for intervenor Transcontinental Gas Pipe Line Corp.

Frederick H. Ritts entered an appearance for intervenor The City of Danville, Virginia.

Edward J. Grenier, Jr. and Sterling H. Smith entered appearances for intervenors The Process Gas Consumers Group, The American Iron and Steel Institute, and Georgia Industrial Group.

William C. Bingham, Jr., entered an appearance for intervenor South Jersey Gas Co.

Joel F. Zipp and Morley Caskin entered appearances for intervenor South Carolina Pipeline Corp.

Paul W. Diehl entered an appearance for intervenor Sun Co., Inc. (R & M).

J. Gordon Pennington and Daniel F. Collins entered appearances for intervenor ANR Pipeline Co.

Michael W. Hall entered an appearance for intervenor The Brooklyn Union Gas Co.

Jerry W. Amos entered an appearance for intervenor Piedmont Natural Gas Co., Inc.

Mary Jane Reynolds entered an appearance for intervenor Dakota Gasification Co.

Before EDWARDS, D.H. GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The petitioners, a group of industrial gas consumers and a local distribution company (LDC), challenge orders of the Federal Energy Regulatory Commission approving two settlements between the Transcontinental Gas Pipeline Corporation (Transco) and its customers. *See Transcontinental Gas Pipe Line Corp.*, 55 FERC ¶ 61,446, *reh'g denied, see* 57 FERC ¶ 61,345. The petitioners are Transco customers that did not join in the settlements. They contend that the agreements are inconsistent with the Natural Gas Act (NGA), the Natural Gas Policy Act (NGPA), and the Commission's own policies. We reject these contentions in large part, but remand the case for the Commission to reconsider whether the customers that benefit from the priority curtailment provision in one of the agreements should be required to compensate the customers that are harmed by virtue of that provision.

## I. BACKGROUND

The Restructuring Settlement calls for Transco to "unbundle" its regulated transportation service from its natural gas sales or merchant service, which by the terms of the settlement is to be priced at market rates. The Transportation Settlement establishes the rates, terms, and conditions of transportation service on the Transco pipeline, using cost-based pricing principles.

## A. The Restructuring Settlement

Under the Restructuring Settlement, Transco will no longer sell gas bundled with transportation service (*i.e.*, delivered gas); instead it will sell gas at the wellhead or pipeline receipt point, to be transported as the buyer sees fit. Transco's sales are to be market-based; that is, the rates are to be negotiated or arbitrated between Transco and its customers. 55 FERC at 62,331. In approving the Restructuring Settlement, the FERC determined that Transco's markets are sufficiently competitive to preclude the pipeline from exercising significant market power in its merchant function and to assure that gas prices are "just and reasonable" within the meaning of the NGA § 4. *Id.* at 62,333. Therefore, in the settlement, the FERC authorized Transco in advance "to establish and to change" individually negotiated rates free of customer challenge under § 4 of the NGA; the "only further regulatory action" possible under the settlement is the Commission's review of Transco's prices under § 5 of the Act, upon the Commission's own motion or upon the complaint of a customer that is not a party to the settlement.

As initially submitted to the FERC, the Restructuring Settlement also contained a "pro rata curtailment provision," which provided that in times of supply shortage Transco would reduce its deliveries "in proportion to each customer's daily entitlement to Transco gas." The Commission rejected this provision on the ground that it did not protect certain high-priority customers (*e.g.*, agriculturalists) "to the maximum extent practicable," as required by Title IV of the NGPA, 15 U.S.C. §§ 3391–94. On rehearing, petitioner Elizabethtown Gas Company challenged this conclusion; in the alternative it argued that if priority distribution is to be permitted then high priority customers should at least be required to compensate lower priority customers for their loss of gas. The FERC rejected these arguments on the ground that such "policy arguments do not overcome the legal requirements under NGPA § 401(a) to give curtailment priority to certain high priority users." 57 FERC at 62,117.

Finally, the Restructuring Settlement imposes a 2.3 cent "volumetric surcharge" upon all sales and transportation customers. The purpose of the surcharge is to enable Transco to recover costs it incurred in connection with its Great Plains coal gasification project.

## B. The Transportation Settlement

The Transportation Settlement provides that rates for transportation services on Transco's pipelines are to be based upon cost-of-service pricing principles. The settlement allocates various costs among classes of transportation customers for the purpose of determining the prices each must pay. The petitioners challenge the allocation of two types of costs.

The first consists of certain fixed costs, such as taxes and return on equity, that are allocated among all the users of the pipeline through a so-called "load factor." An interruptible customer is charged a 100% load factor. A firm customer, however, is charged a 100% load factor only if it uses its full demand entitlement; a firm customer that uses less than its full entitlement pays a greater load factor. The second allocation involves "gathering and storage" costs and costs recorded in Account No. 858 of the Commission's Uniform System of Accounts.

## C. The 1992 Rate Case

In March 1992 Transco filed a new rate case in which it proposed to make changes in its rate structure but to retain basically the same cost allocations as those made in the Transportation Settlement. In particular, the new rate proposal again allocated a 100% load factor to interruptible rate customers and allocated gathering and storage costs and Account No. 858 costs to both transportation and sales customers. The present petitioners renewed their objections to these cost allocations in the 1992 Rate Case.

On May 14, 1993 the Commission issued an order in the 1992 Rate Case upholding several of the petitioners' challenges to Transco's rate design. *See Transcontinental Gas Pipe Line Corporation,* 63 FERC ¶ 61,194. First, with respect to gathering costs, the Commission held that "their inclusion in transportation rates is inconsistent with [the agency's] general rate policy that such services should

be separately stated and billed." *Id.* at 62,-496. Second, the Commission decided that Transco had failed to justify recovering storage costs from transportation customers; accordingly it ordered the company "to file, within thirty days, engineering studies showing how the retained storage is used...." *Id.* at 62,490. Third, the Commission ruled that Transco must remove Account No. 858 costs from its rate base because "a pipeline should not include stranded costs in determining rates until it makes a section 4 filing to recover such costs." *Id.* at 62,496. The Commission rejected the petitioners' challenge to Transco's proposal with respect to the 100% load factor and the Great Plains surcharge. On July 29, 1993, the FERC granted in part a petition for rehearing the May 14, 1993 order in the 1992 Rate Case. Specifically, the Commission agreed to set for an evidentiary hearing the question whether it is appropriate for Transco to use a 100% load factor in designing its rate for interruptible transportation service.

## II. Analysis

The Process Gas Consumers Group, the American Iron and Steel Institute, and the Georgia Industrial Group (collectively referred to below as petitioners) challenge the lawfulness of the market-based pricing called for in the Restructuring Settlement, as well as the aforementioned cost allocations established in the Transportation Settlement. Petitioner Elizabethtown Gas challenges the Commission's rejection of the pro rata gas curtailment plan included in the original Restructuring Settlement.

### A. *Market-based pricing*

■ The petitioners contend that the FERC's approval of market-based pricing for Transco's merchant service constitutes "virtual deregulation" and is "utterly at odds with its NGA obligation to insure that rates are cost-based so that consumers will be protected from abuse at the hands of natural gas companies." Pointing to the Supreme Court's statement that "the prevailing price in the market cannot be the final measure of 'just and reasonable' rates mandated by the Act," *FPC v. Texaco, Inc.,* 417 U.S. 380, 397,

94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974), the petitioners maintain that the FERC was required to adhere to its historical policy of basing rates upon the cost of providing service plus a fair return on invested capital. *See Alabama Electric Coop. v. FERC,* 684 F.2d 20, 27 (D.C.Cir.1982).

In our view, that is not a tenable position. First, nothing in *FPC v. Texaco, Inc.* precludes the FERC from relying upon market-based pricing. The Supreme Court's point in that case was only that where the Congress has "subject[ed] producers to regulation because of anticompetitive conditions in the industry," *id.* 417 U.S. at 399, 94 S.Ct. at 2327, the market cannot be the "final" arbiter of the reasonableness of a price. 417 U.S. at 397, 94 S.Ct. at 2326. In *Texaco,* the Commission had failed even to mention the "just and reasonable" standard; it appeared to apply only the "standard of the marketplace" in reviewing the "reasonableness" of a rate. 417 U.S. at 396–97, 94 S.Ct. at 2325–26. Here, in contrast, the FERC has made it clear that it will exercise its § 5 authority (upon its own motion or upon that of a complainant) to assure that a market (*i.e.,* negotiated) rate is just and reasonable. 57 FERC at 62,113.

Second, the Supreme Court "has repeatedly held that the just and reasonable standard does not compel the Commission to use any single pricing formula ...," *Mobil Oil Exploration v. United Distribution Co.,* 498 U.S. 211, 224, 111 S.Ct. 615, 624, 112 L.Ed.2d 636 (1991), and we have indicated that when there is a competitive market the FERC may rely upon market-based prices in lieu of cost-of-service regulation to assure a "just and reasonable" result. *See Tejas Power Corp. v. FERC,* 908 F.2d 998, 1004 (D.C.Cir.1990) ("In a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that the price is close to marginal cost, such that the seller makes only a normal return on its investment"). *See also Farmers Union Central Exchange v. FERC,* 734 F.2d 1486, 1510 (D.C.Cir.1984).

Here the Commission specifically found that "Transco's markets are sufficiently com-

petitive to preclude it from exercising significant market power in its merchant function...." 55 FERC at 62,334. In support of this conclusion, the FERC noted that "Transco will be providing comparable transportation service with respect to all gas supplies whether purchased from Transco or its competitors" and that "adequate divertible gas supplies exist" to assure that Transco will have to sell at competitive prices. *Id.* The petitioners point to no record evidence to the contrary. It appears, therefore, that Transco will not be able to raise its price above the competitive level without losing substantial business to rival sellers. *Id.* Such market discipline provides strong reason to believe that Transco will be able to charge only a price that is "just and reasonable" within the meaning of § 4 of the NGA.

In their reply brief, the petitioners alter the focus of their argument, contending that the Restructuring Settlement is inconsistent with the various reporting requirements of the NGA. *See* 15 U.S.C. §§ 717c(c) & (d) (requiring pipelines to file rate schedules and give advance notice of rate changes). This contention appears nowhere in the petitioners' original brief and they cite no reference to it in their various pleadings before the FERC. Accordingly, pursuant to § 19(b) of NGA, we do not reach this contention. 15 U.S.C. § 717r(b).

### B. *Cost allocations*

The Transportation and Restructuring Settlements purport to implement the principle that in setting transportation rates prices should be based upon costs. The petitioners contend that the settlements violate this principle by allocating certain sales costs to transportation customers and certain firm customer costs to interruptible customers.

### 1. *The 100% load factor.*

■ The petitioners first argue that applying the same 100% load factor to interruptible and firm service is inconsistent with the Commission's Policy Statement on cost allocation. *See Policy Statement Providing Guidance with Respect to the Designing of Rates,* 47 FERC ¶ 61,295, (May 30, 1989), *ord. on reh'g and clarif.,* 48 FERC ¶ 61,122

(July 12, 1989). In that Policy Statement the Commission indicates that the costs associated with a particular class of users should be allocated to those users so that rates serve efficiently to ration pipeline capacity. In particular, the FERC states there that a firm customer should usually pay a higher rate than an interruptible customer because it is more costly to provide guaranteed service on demand. *See Clarifying Policy Statement,* 48 FERC at 61,446.

The petitioners also argue that, in allocating a 100% load factor to interruptible customers, the Commission unreasonably ignored its own commitment to consider the quality of service in setting relative transportation rates. *See generally,* 47 FERC at 62,058. Transco's interruptible service is "decidedly inferior" to its firm service, they claim in their brief, because "market capacity is severely constrained" and "no interruptible service at all [can] be scheduled for long periods."

The petitioners' position is by no means illogical, but it proceeds from an erroneous premise. Firm customers as a class are in fact charged a higher rate than interruptible customers under the pricing structure approved in the Transportation Settlement, reflecting the cost and quality differentials between the two classes of customers. The 100% load factor is only the lowest per unit rate that a firm customer can in principle pay, *i.e.,* if it takes 100% of its demand entitlement. Because many firm customers do not take all of their entitlements, firm customers overall end up paying a greater load factor than interruptible customers, who never pay more than the 100% load factor. *See* 55 FERC at 62,355-56; 57 FERC at 62,121. *See also Orange and Rockland Utilities, Inc. v. FERC,* 905 F.2d 425, 427-28 (D.C.Cir.1990) (accepting as "plausible" FERC's argument that 100% load factor accounts for quality difference between firm and interruptible service because "a firm customer would pay as little per unit *only* if it bought its full contract quantity") (emphasis in original). Therefore, we reject the petitioners' objection to the 100% load factor allocation scheme in the Transportation Settlement.

Additionally, the petitioners argue that the FERC's "summary" disposition of the 100% load factor issue in Transco's 1992 Rate Case is inconsistent with (1) the agency's assurance in its brief in this case that it would reexamine this issue in the pipeline's next rate case and (2) other pipeline restructuring orders, in which the Commission has held a separate hearing in order to develop a record on the proper load factor. The petitioners' objections, however, properly relate to the 1992 Rate Case, not to the orders under review. The Commission never represented in the orders under review that it would revisit, much less hold an evidentiary hearing on, the load factor issue. In any event, as we noted above, the FERC has since agreed to hold an evidentiary hearing on the proper load factor. Thus, the petitioners will have a forum for the presentation of evidence bearing upon the load factor issue, but not in this case.

2. *Gathering, storage, and Account No. 858 costs.*

■ The petitioners next contend that, by approving transportation rates that bundle gathering, storage, and Account No. 858 costs into generally applicable transportation rates, the FERC acted in "complete disregard of its regulations, stated rate policies, and decisions in other cases," i.e. arbitrarily and capriciously or otherwise contrary to law. According to the petitioners, these cost allocations work "classic cross-subsidies" because they require some "customers to pay the cost of services they do not use ...," in derogation of the Commission's general commitment to allocating costs to the users that cause the pipeline to incur them.

a. *Gathering costs:* The FERC refused to require that gathering costs be unbundled on the ground that unbundling would be "unfair to producers located behind Transco's Tilden processing plant who would suffer a sudden 18.4 cent per Dt erosion in their netback value," whereas bundling gathering costs into transportation rates would have no noticeable effect upon any producer. 55 FERC at 62,356. The petitioners argue that the FERC's approach interferes with market

signals without creating any systemwide benefit and is therefore impermissible.

It is the FERC's established policy to consider equitable factors in designing rates, and to allow for phasing in of changes where appropriate. In its *Clarifying Policy Statement,* the Commission stressed that it would make "pragmatic adjustments in the event a particular method is theoretically consistent with the Commission's objectives but leads to undesirable or inequitable results." 48 FERC at 61,442; *see also Policy Statement,* 47 FERC at 62,054. It is hardly arbitrary or capricious so to temper the dictates of theory by reference to their consequences in practice. *Cf. Columbia Gas Transmission Corp. v. FERC,* 750 F.2d 105, 109 (D.C.Cir.1984) (recognizing "that the Commission has broad authority to fashion remedies so as to do equity consistent with the public interest").

Nor has the Commission made an open-ended commitment to preserve the few producers located behind the Tilden processing plant from the burdens that in principle should be theirs. On the contrary, the FERC acted on a strictly interim basis in the "context of [an] overall settlement," in which "regulation cannot always be as precise as theory"; indeed, the Commission said that it "expect[ed] to fine tune the rates in Transco's next rate case." 55 FERC at 62,357. (That was not an empty promise either; as recounted above, in the 1992 Rate Case the Commission held that gathering costs could not be included in transportation rates, invoking its general policy that a customer should pay only for the services and facilities that it uses.)

b. *Storage costs:* The petitioners likewise object to the FERC's approval of the settlement insofar as costs associated with the Hester storage field were included in generally applicable transportation rates, on the ground that "shippers who stay in balance, have reliable suppliers, or have their own storage have no need for storage on Transco and no reason to pay for services they do not use." The petitioners' contention that they receive no benefit because they do not use Transco's storage is not necessarily sound, however. For as the venerable Milton said (in quite another context, to be sure), "They

also serve who only stand and wait." *Cf. Clarifying Policy Statement,* 48 FERC at 61,452 ("the Commission's statement that 'a pipeline should only charge for gathering and storage services actually performed for a customer' should not be read to mean that rates cannot contain costs relating to a service which is not used but which benefits a customer").

The Commission noted in the 1991 Order that "at least some [storage] costs will be incurred for a major long haul pipeline to provide Part 284 transportation service." 55 FERC at 62,356. More specific to this case, the Commission pointed out that all shippers benefit from Transco's agreement to use its storage facilities in order to handle daily imbalances, which allowed Transco to eliminate daily scheduling and balancing penalties. *Id.* at 62,357.

The FERC also reasoned that unbundling storage costs before experience was gained under the restructured system would be impractical because it would be difficult if not impossible to anticipate how much Transco would use its storage capacity for sales as opposed to transportation customers. *Id.* Noting that "Transco's settlement is a substantial advance in the direction of unbundling storage costs," the FERC invited the petitioners to "raise the issue [of further unbundling] in Transco's next rate case," "by which time the parties and the Commission will have the benefit of actual experience under the new penalty provisions." *Id.* Such an approach represents a reasonable response to the difficulties presented by the move from bundled to unbundled service. Therefore, we hold that the FERC acted permissibly in refusing to require the unbundling of storage costs at the Hester facility.

c. *Account No. 858 costs:* The petitioners next object to Transco's bundling its Account No. 858 costs into its transportation rates. The costs in question are the demand charges that Transco pays to the upstream pipelines that agreed to let Transco assign its entitlements to its shippers. The petitioners argue that insofar as they do not use upstream transportation services, the bundling of these costs into transportation rates subsi-

dizes Transco and its sales customers at the expense of its transportation customers.

The Commission noted that interruptible customers who actually use the upstream facilities will pay for Account No. 858 capacity through the IT Rate. It upheld the inclusion of such costs in firm transportation rates "because firm transportation customers have chosen to obtain the benefits of being able to rely on Account No. 858 capacity on a firm basis." 57 FERC at 62,123. As it did with regard to storage costs, that is, the Commission determined that the right to use a facility inures to the benefit of those who may not in the event avail themselves of that right. Although the principle obviously must have its limits, both logical and temporal, we do not think the Commission acted arbitrarily in invoking it in the context of this interim decision.

As we have noted, the Commission promised to revisit these allocation issues in Transco's 1992 rate case, did so, and ultimately reversed itself. We are satisfied, however, that the FERC's refusal to unbundle gathering, storage, and Account No. 858 costs in its 1991 order was reasonable when made.

3. *Great Plains surcharge.*

■ Finally, the petitioners object on cost-causation grounds to the 2.3 cent "volumetric surcharge" to be levied upon all sales and transportation services as part of the Restructuring Settlement. The Commission approved the surcharge in order to enable Transco to recover a portion of the "above market" costs it incurred in connection with the now abandoned Great Plains coal gasification project. The agency reasoned that, because the expected "technological benefits would have redounded to all future gas users ... by increasing the supply of available gas," all of Transco's customers should share in the cost of this failed project. 55 FERC at 62,341. The petitioners challenge this decision as another departure from the principle that customers should pay rates based only upon the costs they cause the pipeline to incur.

In response, the FERC refers us to *K N Energy, Inc. v. FERC,* 968 F.2d 1295, 1300–1302 (D.C.Cir.1992), for the proposition that

in certain unusual circumstances it may abandon the cost-causation principle and instead base rates upon "cost-spreading" and "value-of-service" rationales. In *K N Energy* the Commission approved a volumetric surcharge for certain transportation customers in order to help resolve the "take-or-pay" crisis in the pipeline industry. *See id.* at 1301. The Commission explained both that it was necessary, because of the magnitude of that crisis, to spread the cost of its resolution across the entire natural gas industry, and that it was proper that all segments of the industry, including those that did not cause the take-or-pay problem, share in the cost of its resolution, as all would benefit therefrom. This court accepted the FERC's general principle that cost-spreading and value-of-service considerations could justify a volumetric surcharge that could not be justified as a matter of cost causation. We remanded the case only because the FERC had not provided a sufficient explanation for its decision to rely upon those considerations in the circumstances of that case.

Upon the precedent of *K N Energy,* the Great Plains surcharge at issue in the present case is lawful. As the Commission noted, had the Great Plains plant succeeded in increasing the supply of natural gas, it would have contributed also to reducing the price of natural gas, to the benefit of all natural gas customers. (Indeed, buyers of competing fuels would have benefited, too.) Transco's transportation customers would have benefited because they are by definition purchasers of natural gas—whether from Transco or from another supplier. Accordingly, we uphold as reasonable the volumetric surcharge included in the Restructuring Settlement.

## C. *Pro rata curtailment provision*

Elizabethtown Gas contends that by insisting upon priority curtailment, rather than pro rata curtailment as provided in the original Restructuring Settlement, and by refusing to require compensation for low priority users, the Commission misinterpreted § 401(a) of the NGPA, 15 U.S.C. § 3391(a), and acted in an arbitrary and capricious manner. First, Elizabethtown claims that the original pro rata plan was proper under

the terms of § 401(a) because it provided the greatest "practicable" protection for high priority users, such as agriculturalists. Greater protection for those users is not practicable because, we are told, Transco's firm sales are greatly reduced under the Restructuring Settlement and "Transco will cease to be the dominant firm supplier" to its LDC customers. This argument makes no sense to us. Even if Transco supplies a smaller share of the gas bought by each of the LDCs, the gas it does deliver to them could still in times of shortage go first to "high-priority users." Accordingly, it seems entirely "practicable" to increase the level of protection for high priority users above that provided by the pro rata plan.

Second, Elizabethtown argues that the FERC's decision is arbitrary because the Commission has approved prior Transco settlements that did not protect high priority users. In 1978 the FERC approved a settlement agreement that made no provision for the protection of high priority users; indeed it did so notwithstanding an admitted lack of information about "whether the then existing curtailment plans of interstate pipelines can adequately protect essential agricultural users from curtailment." *Transcontinental Gas Pipe Line Corp.,* 6 FERC ¶ 61,050, at 61,112, *reh'g denied,* 8 FERC ¶ 61,117 (1979). Further, in 1989 the FERC approved an Interim Restructuring Settlement that made specific provision for priority curtailment.

Those prior decisions are not controlling in this case, however, because the lawfulness of the treatment afforded high priority users was not contested in either of them. In the first case, the FERC found that in the particular circumstances there present the interests of high priority users were not put at risk by virtue of the settlement. *See* 8 FERC at 61,412–13. Moreover, the Commission specifically noted that only parties to the settlement were bound by it, and the Commission forewarned them that it would not be bound "if ... [it is] in the future presented with the situation where performance of [its] statutory duties (under either the Natural Gas Act or the National Energy Act) is found to conflict with this [curtailment] provision." 6 FERC at 61,111. As for the second settle-

ment, no party challenged the curtailment plan and the Commission did not even discuss the treatment of high priority users. *See Transcontinental Gas Pipe Line Corp.,* 48 FERC ¶ 61,399 (1989).

Elizabethtown's third argument is that the FERC should have required high priority customers to compensate low priority customers if the former group benefits at the expense of the latter during a period of curtailment. Responding in its order on rehearing, the Commission stated only that "[t]he petitioners' policy arguments do not overcome the legal requirement under NGPA § 401(a) to give curtailment priority to certain high priority users. Until Congress changes the statute, the statutory priority must be observed." 57 FERC at 62,117.

■ As Elizabethtown points out, however, this court has clearly held that a compensation provision is not necessarily inconsistent with § 401(a). In *Consolidated Edison Co. v. FERC,* 676 F.2d 763, 767 n. 9 (D.C.Cir. 1982), we said that "there is nothing inherently inconsistent about allocating natural gas to those who are most in need of it while requiring the beneficiaries of such a plan to compensate those who must purchase more expensive alternative supplies." *See also Elizabethtown Gas Co. v. FERC,* 575 F.2d 885, 888–89 (D.C.Cir.1978). Therefore, the FERC's conclusion that § 401 disables it from requiring curtailment compensation seems plainly incorrect.

The Commission's only response is that Elizabethtown did not raise the compensation issue with sufficient clarity in its petition for rehearing to preserve the point for review. Elizabethtown's petition, as restated by the Commission itself in the course of denying rehearing, *see* 57 FERC at 62,117 n. 57, asked that a high priority user be required "to pay compensation to the LDCs who must suffer a greater than pro rata curtailment on Transco's system in order to supply" the customer. Because it is clear that the petitioner preserved its argument on rehearing, we remand this aspect of the case to the agency for it to do what it should have done in the first instance—consider on the merits the petitioner's request for a curtailment compensation scheme.

## III. CONCLUSION

We uphold the FERC's approval of the Restructuring Settlement with respect to the unbundling of sales and transportation services and market-based pricing of sales. We also uphold the allocation under the Transportation Settlement of a 100% load factor to interruptible customers; the allocation of gathering, storage, and Account No. 858 costs to transportation as well as sales customers; and the allocation under the Restructuring Settlement of the Great Plains surcharge to both sales and transportation customers. We remand this matter to the Commission to consider whether customers that benefit from priority curtailment should be required to compensate lower-priority customers.

*So ordered.*