OFFICE OF COMMUNICATION OF the UNITED CHURCH OF CHRIST, National Urban League, National Association for the Advancement of Colored People, Communications Commission of the National Council of the Churches of Christ in the USA, and UNDA–USA, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

National Black Media Coalition, National Organization for Women, Boston Broadcasters, Inc., American Broadcasting Companies, Inc., Intervenors.

No. 676, Docket 76–4187.

United States Court of Appeals, Second Circuit.

Argued April 27, 1977.

Decided Aug. 5, 1977.

Ellen Shaw Agress, New York City (Earle K. Moore, Nathaniel R. Jones, Moore, Berson & Lifflander, New York City, of counsel), for petitioners.

Collot Guerard, Washington, D. C. (Mark S. Carlin, Law Student Intern, Media Access Project, Washington, D. C., of counsel), for intervenor National Organization for Women.

Nolan A. Bowie, Frank W. Lloyd III, Washington, D. C. (Emil Ward, Student Intern, Citizens Communication Center, Washington, D. C., of counsel), submitted a brief for intervenor National Black Media Coalition.

Benito Gaguine, Herbert M. Schulkind, Howard J. Braun, Eric S. Kravetz, Fly, Shuebruk, Blume, Gaguine, Boros & Schulkind, Washington, D. C., submitted a brief for intervenor Boston Broadcasters, Inc.

Raymond L. Strassburger, Counsel, F.C.C., Washington, D. C. (Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Donald I. Baker, Asst. Atty. Gen., Barry Grossman, Joen Grant, Attys., Dept. of Justice, Washington, D. C., of counsel), for respondents.

Before MEDINA and OAKES, Circuit Judges, and MISHLER, District Judge.*

* Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

OAKES, Circuit Judge:

Petitioners seek review pursuant to 47 U.S.C. § 402(a) of an order of the Federal Communications Commission (the Commission or FCC). The order adopted new guidelines for the preparation by broadcast applicants of written equal employment opportunity (EEO) programs to be filed with their broadcast license renewal applications. It also amended the Commission's EEO rules applicable to broadcast licensees by changing the employment threshold for required submission of detailed written EEO programs. Formerly those broadcast stations employing five or more full-time employees were required to submit such programs; under the order only those employing more than ten full-time employees must do so.[1] *In re Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees,* 60 F.C.C.2d 226 (1976). We grant the petition to review the order and set it aside as arbitrary and capricious insofar as it changes the policy of the Commission by extending the exemption for stations with fewer than five full-time employees to those with ten or less full-time employees.

I.

EEO enforcement is not the FCC's mission. Thus it had no obligation to promulgate EEO regulations. But it does possess the power to issue such regulations in furtherance of its statutory mandate to ensure that broadcasters serve all segments of the community. *See NAACP v. FPC,* 425 U.S. 662, 670 n.7, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976). It exercised that power in 1969 by adopting two rules that prohibited employment discrimination and required broadcast stations to establish an EEO program. It also proposed two additional rules that required stations with five or more full-time employees to submit a reporting

1. The rules involved are 47 C.F.R. §§ 73.125, 73.301, 73.599, 73.680, 73.793 (1976). The provisions of each are identical, but are applicable to different components of broadcast service.

form containing statistical data on the employment of minorities (Form 395) and to reduce to writing and file with the FCC an EEO program. 18 F.C.C.2d 240. The two proposed rules were adopted in 1970. 23 F.C.C.2d 430. Dissatisfaction with the effectiveness of the regulation requiring written and filed EEO programs led to the FCC's proposal that it be modified, 54 F.C.C.2d 354 (1975), and it was modified in 1976 by changing the threshold for required submission of an EEO program from stations with five or more employees to stations with more than ten employees and by requiring more detailed submissions from the remaining stations, 60 F.C.C.2d 226. Petitioners argue that the change in thresholds cannot be justified.[2]

## II.

 The general standard for reviewing informal agency rulemaking is "a narrow one." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether the agency has articulated a rational connection between the facts found and the choice made. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court may not supply a ground that the agency has not itself relied upon, *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), but will uphold a decision if the agency's reasoning may reasonably be discerned, *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

 When initial cut-off or threshold criteria for determining the applicability of particular regulations are involved, the agency's reasoning need at times consist only of "practical considerations of administration," *Goldberg v. Weinberger,* 546 F.2d 477, 480 (2d Cir. 1976) (Act of Congress), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (U.S. May 31, 1977), since there are times when arbitrariness is inevitable. Such a time was 1970, when the original threshold for submission of an EEO program was enacted by the FCC. Practical considerations of administration suggested that some threshold was necessary, and, without the benefit of experience in the field, the somewhat arbitrary choice of five employees must be considered as good as any other.

 The situation in the instant case is quite different. Here the Commission is seeking to change its policy, and, as held in *Columbia Broadcasting System, Inc. v. FCC,* 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026 (1971), such changes in policy must be rationally and explicitly justified in order to assure "that the standard is being changed and not ignored, and . . . that [the agency] is faithful and not indifferent to the rule of law." Although an agency must be given flexibility to reexamine and reinterpret its previous holdings, it must clearly indicate and explain its action so as to enable completion of the task of judicial review. *Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 806–09, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973) (plurality opinion). There must be a thorough and comprehensible statement of the reasons for the decision, *see* Administrative Procedure Act § 4(b), 5 U.S.C. § 553(c); *National Nutritional Foods Association v. Weinberger,* 512 F.2d 688, 701 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). In this case, therefore, the FCC did not have the leeway that may be given an agency in the initial promulgation of cut-off criteria for the appli-

---

2. Intervenors National Organization for Women (NOW) and Boston Broadcasters, Inc., make the secondary argument that additional information which the intervenors believe would improve EEO enforcement should also be required of broadcast stations. We are satisfied that these ideas were considered by the FCC and that its decision concerning which information to require of its licensees was a reasonable one. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

cability of regulations. We deal here with a change in such criteria, and hence we must find that the FCC had a rational, articulated explanation for its action in order to uphold its decision.

### III.

■ To justify the policy change, the FCC appears to reason as follows: (1) because the Commission's resources were inadequate even under the previous standards, and because new EEO rules require that stations submit more information, a reduction in jurisdiction would make enforcement efforts as to covered stations more effective; (2) the EEO programs serve little or no purpose at stations with ten or fewer employees because such stations have no formal personnel procedures that can be reformed and because the statistics that are yielded by EEO submissions from such stations are not reliable due to the small number of people in each sample; (3) because the EEO programs serve little purpose for small stations, the burden they impose on such stations is unjustified; (4) finally, we are reassured, the great majority of industry employees are still covered under the new regulations. We find these justifications for the FCC action unsupported or inadequate on the record before us and therefore reverse the FCC order as arbitrary and capricious.

First, the FCC change is said to be motivated by the workload of the Commission. But the same argument was made by Commissioner Lee dissenting in part from the proposal to create the Commission's EEO rules in 1969. 18 F.C.C.2d at 246–47. The Commission majority at that time rejected the idea that "workload problems" should prevent it from attempting "to assure equal employment opportunity, especially in view of the urgent national need . . . ." The Commission concluded: "We believe it vital that such action be taken." *Id.* at 243. The Commission again rejected the workload argument when it adopted the written EEO program requirement in 1970, both because of this "vital national concern" and because the burden was seen as minimal

since the filings could "be treated as any other part of the [broadcast license renewal] application." 23 F.C.C.2d at 433 n.4. The Commission does not argue, nor could it, that the need for equal employment opportunity has become less urgent in the intervening years. It apparently means either that it has now found that it does not have the resources to do the job or that the somewhat more lengthy EEO filings which it is henceforth going to require of larger stations would strain its resources past the limit if they were applied to stations with less than ten employees.

■ No evidence to support this rationale, however, has been presented by the FCC. Indeed, though some emphasis was placed on this point in oral argument and in the brief on appeal, it is mentioned only in passing in the FCC's notice of proposed rulemaking, 54 F.C.C.2d at 360, and not at all in the Report and Order that adopted the changed threshold, 60 F.C.C.2d 226. Not only is no evidence adduced to support the claim of overstrained resources, but no conclusion is ever reached by the Commission in this record that its resources are or would be overstrained. As the Supreme Court ruled in *FPC v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974):

> [W]e cannot "accept appellate counsel's *post hoc* rationalizations for agency action"; for an agency's order must be upheld, if at all, "on the same basis articulated in the order by the agency itself."

*Id.* at 397, 94 S.Ct. at 2326, *quoting Burlington Truck Lines, Inc. v. United States, supra,* 371 U.S. at 168–69, 83 S.Ct. 239. Thus the FCC's decision cannot be supported on the first ground put forward here by the Commission.

■ The FCC's second point is that EEO programs serve no purpose at small stations that do not have either enough employees to make the statistics meaningful or formal personnel procedures to be reformed. The Commission's decision cannot be supported on this ground, however, because again it is changing its prior position without explanation. As to the formality of small station personnel proce-

dures, the FCC recognized in originally proposing its EEO rules that the comprehensiveness of EEO programs would vary with the size and location of stations, 18 F.C.C.2d at 244, but concluded that in all stations with five or more full-time employees, "[t]hese written programs will enable licensees to focus, in terms of their individual situations, upon the best method of assuring effective equal employment practices," id. When the Commission later gave final approval to its rules, it reiterated that it did "not expect small stations to submit elaborate programs" and that the purpose of the rules is to "make the broadcaster focus on the problem." 23 F.C.C.2d at 433. It concluded the rules could "be met by all stations, large or small, with reasonable good will." Id. No matter how informal a station's procedures, the requirement that it periodically think about its EEO efforts seems wholly reasonable. The FCC does not explain why it has changed its mind, and it thus cannot justify its changed position on this ground.

In reply to the contention that "statistical data can only be useful . . . when large numbers are involved," 23 F.C.C.2d at 431, the FCC wrote in 1970 that this objection misunderstood the purpose for which the data was being collected: "We have not suggested that such data for any particular

year would demonstrate the existence of discrimination at any station. What we do believe is that it is useful to show industry employment patterns and to raise appropriate questions as to the causes of such patterns." Id. The FCC does not suggest in the present case that small station statistics are not still "useful" for this purpose. Instead, the Commission merely says that in its experience statistics from small stations are not sufficiently meaningful to prove discrimination. 60 F.C.C.2d at 240–41. It did not claim such a purpose for its rules when it enacted them, and it cannot now justify a change in them merely by stating that the rules do not serve a purpose that had nothing to do with their enactment.

The FCC's third point is that small stations are excessively burdened by the filing of an EEO program. The Commission did not view this as a problem when it adopted its rules, 23 F.C.C.2d at 432 n. 2, and, while experience since 1970 might have shown the existence of such a problem, we can find no evidence in the record to this effect. It is clear that elaborate programs are not expected of small stations, 23 F.C.C.2d at 433, and as we read the model EEO program that the Commission appended to its current order, 60 F.C.C.2d at 249, only a few hours each year would be required to complete it.[3] The only statistics required out-

---

**3.** The model program is only five pages long. It is in ten parts. The first involves a general policy statement to the effect that the station provides and promotes equal employment opportunity. The second names the individual (and his title) responsible for the administration of the EEO program but notes that it is the responsibility of all persons making employment decisions to ensure adherence to the program. The third relates to "policy dissemination," setting forth communication efforts as to equal employment opportunity with four paragraphs that may or may not be checked off by the licensee, the first relating to notice to prospective employees on the employment application form, the second to notice informing applicants and employees that the station is an equal opportunity employer, the third indicating that union cooperation is sought and that union contracts contain a nondiscrimination clause, and a fourth relating to unspecified "other" policy dissemination.

The fourth paragraph refers to the licensee's recruitment efforts, again with six paragraphs

to be checked: the first indicates examples of organizations contacted during the past twelve months, with the aim of encouraging referral of qualified minority and female applicants; the second relates to employment agencies contacted, specifying which are EEO agencies; the third relates to area schools and colleges with significant minority and female enrollments; the fourth to help wanted ads (which give no indication of any preferences and include notices to the effect that the station is an equal opportunity employer); the fifth to media with significant circulation or of particular interest to minorities and women; and the sixth to encouragement of existing employees to refer minority and female candidates for existing and future job openings.

The fifth paragraph of the model program relates to training and contains four alternative paragraphs, the first to the effect that station resources and needs are such that the station has no specific program, another to the effect that it does have on-the-job training, describing the tangible benefits thereof, the third relating

side of the employer's file are local or regional percentages of minorities and women in the area's workforce or population, figures that could be easily gathered at a local library, newspaper office, or governmental agency. Once again, the FCC has changed its mind without telling us why.

The FCC finally points out that even with the reduction in coverage, it will still require EEO programs from stations employing 84.9% of the broadcast industry's workforce. Of course, this cannot in itself be a reason to change a policy that regulated an even greater percentage of the industry. This number, moreover, is not as reassuring as it appears. The Commission's change of threshold more than doubles the number of exempted stations from 21.3% to 54% of all broadcast stations, and the petitioners submitted to the FCC a study in Michigan which indicated that stations with fewer than ten employees, which have 15.1% of the jobs in the industry, had 32% of the job opportunities and 41.7% of the entry-level job opportunities. While the FCC points out the methodological deficiencies in this study, it has offered no contrary data of its own and no response to the central point the petitioners make: that, due to higher turnover and a greater willingness to hire inexperienced personnel, the small stations have more entry-level jobs— how many more may be debated—than their total employee strength indicates.

Thus, in every particular, the FCC has failed to articulate a reasoned explanation for its action. It cannot alter its regulation until it does so.

Petition granted. Order set aside insofar as it alters the threshold for stations large enough to be required to submit EEO programs.

to any assistance that the station might give to students, schools or colleges in broadcast training programs, and a fourth relating to "other." The sixth paragraph of the program is the only one that calls for the station to gather information outside of its own files; it requests the percentages of the workforce (or population) that are women, blacks, orientals and other minority groups, either in the standard metropolitan statistical area, the city, county, or other region involved.

The seventh paragraph is a current employment survey, which is divided as between stations with 50 or more and those with fewer than 50 full-time employees, in the latter case allowing a station either to state that there has been no change or, if there has been change since the previous period, to identify the incumbents under each job category for a specified two-week period. Since the FCC form relating to job categories (Form 395) has to be filed even by those stations that would be exempted under the new rule by having more than five but fewer than eleven employees, this would require very little effort on the part of now-exempted stations. The eighth paragraph of the model program simply requests the number of persons hired during the preceding 12-month period, the number of whom were minorities and the number of whom were women. The ninth paragraph speaks of a policy to provide promotion on a nondiscriminatory basis and asks that the results of that policy be set forth. The tenth and last paragraph simply seeks a brief narrative discussion of the effectiveness of the station's efforts to ensure equal employment opportunity.