WOLD COMMUNICATIONS,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Westinghouse Broadcasting and Cable, Inc., Citicorp, Turner Broadcasting Systems, Inc., Home Box Office, Inc., Hughes Communications, Inc., Southern Pacific Communications Co., MCI Telecommunications Corp., American Broadcasting Companies, Inc. and CBS, Inc., Western Union Telegraph Company, Southern Pacific Satellite Co., Viacom International, Inc., National Cable Satellite Corp., Spanish International Network, Inc., Intervenors.

WOLD COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Western Union Telegraph Company, MCI Telecommunications Corp., Southern Pacific Communications Co., Westinghouse Broadcasting and Cable, Inc., Hughes Communications, Inc., American Broadcasting Companies, Inc., and CBS, Inc., GTE Satellite Corporation, Home Box Office, Inc., Turner Broadcasting System, Inc., Citicorp, Dow Jones & Company, Inc., Southern Pacific Satellite Co., Viacom International, Inc., National Cable Satellite Corp., Spanish International Network, Inc., Intervenors.

SATELLITE SYNDICATED SYSTEMS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Western Union Telegraph Company, Southern Pacific Communications Co., Westinghouse Broadcasting and Cable, Inc., Hughes Communications, Inc., American Broadcasting Companies, Inc., and CBS, Inc., Citicorp, Turner Broadcasting System, Inc., Home Box Office, Inc., GTE Satellite Corporation, RCA American Communications, Inc., Dow Jones & Company, Inc., Southern Pacific Satellite Company, Viacom International, Inc., National Cable Satellite Corp., Spanish International Network, Inc., Intervenors.

SATELLITE SYNDICATED SYSTEMS,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Westinghouse Broadcasting and Cable, Inc., Citicorp, Turner Broadcasting System, Inc., Home Box Office, Inc., RCA American Communications, Inc., Western Union Telegraph Company, Southern Pacific Communications Co., American Broadcasting Companies, Inc., and CBS, Inc., Hughes Communications, Inc., GTE Satellite Corporation, Dow Jones & Company, Inc., Southern Pacific Satellite Co., Viacom International, Inc., National Cable Satellite Corp., Spanish International Network, Inc., Intervenors.

WOLD COMMUNICATIONS,
INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Southern Pacific Satellite Company,
Intervenor.

Nos. 82–2054, 82–2055, 82–2078, 82–2079 and 82–2422.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1983.

Decided June 1, 1984.

Donald E. Ward, Washington, D.C., for appellants/petitioners in all cases.

Robert F. Corazzini and Deborah L. Stuehrmann, Washington, D.C., were on brief, for Satellite Syndicated Systems, Inc., petitioner in No. 82–2078 and appellant in No. 82–2079.

Bruce E. Fein, Gen. Counsel, F.C.C., Washington, D.C., with whom Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Deputy Associate Gen. Counsel, Linda L. Oliver, Counsel, F.C.C., Robert B. Nicholson and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellees/respondents. Stephen A. Sharp and Jane E. Mago, Counsel, F.C.C., Washington, D.C., also entered appearances for F.C.C.

Jack N. Goodman and W. Theodore Pierson, Jr., Washington, D.C., for Home Box Office, Inc.; W. Gilbert Faulk, Jr. and Thomas Pace, Tucson, Ariz., for Dow Jones & Co., Inc.; James R. Hobson and Philip Walker, Washington, D.C., for GTE Satellite Corp.; E. William Henry, Lawrence P. Keller and Harvey J. Shulman, Washington, D.C., for Turner Broadcasting System, Inc. were on joint intervenors brief in Nos. 82–2054 and 82–2055.

Michael H. Bader, Kenneth A. Cox, William J. Byrnes, John Wells King, Joel Rothstein Wolfson and Ruth S. Baker-Battist, Washington, D.C., were on brief, for intervenor MCI Telecommunications Corp. in Nos. 82–2054 and 82–2055.

Tedson J. Meyers, Michael W. Faber and Joel S. Winnik, Washington, D.C., were on brief, for intervenor Citicorp in Nos. 82–2054, 82–2055, 82–2078 and 82–2079.

Henry Goldberg and Ben C. Fisher for Hughes Communications, Inc.; James R. Hobson for GTE Satellite Corp.; William H. Crispin for National Cable Satellite Corp.; Mitchell F. Brecher and Mark P. Bresnahan, Washington, D.C., for Southern Pacific Satellite Company; Herbert E. Forrest, Washington, D.C., for Spanish International Network, Inc.; Steven S. Fadem, New York City, for Viacom International, Inc.; Thomas J. Casey and Robert N. Green, Washington, D.C., for Western Union Telegraph Co. were on the joint intervenors brief in Nos. 82–2054, 82–2055, 82–2078 and 82–2079. Bruce D. Sokler, Joel Yohalem and H. Richard Juhnke, Washington, D.C., also entered appearances for Western Union Telegraph Co.

John D. Lane and Ramsey L. Woodworth, Washington, D.C., were on brief, for intervenor Westinghouse Broadcasting and Cable, Inc. in Nos. 82–2054, 82–2055, 82–2078 and 82–2079.

Joseph M. Kittner and Randolph J. May for ABC, Inc., and Joseph DeFranco, Washington, D.C., for CBS, Inc., were on the joint intervenors brief in Nos. 82–2054, 82–2055, 82–2078 and 82–2079.

Mark P. Bresnahan, Washington, D.C., entered an appearance for intervenor Southern Pacific Communications Co. in Nos. 82–2054, 82–2055, 82–2078 and 82–2079.

Mitchell J. Brecher and Mark P. Bresnahan, Washington, D.C., entered appearances for intervenor Southern Pacific Satellite Co. in Nos. 82–2054, 82–2055, 82–2078, 82–2079 and 82–2422.

Jay E. Ricks, David J. Saylor, Peter A. Rohrbach, Washington, D.C., and Carl J. Cangelosi, Piscataway, N.J., entered appearances for intervenor RCA American Communications, Inc. in Nos. 82–2078 and 82–2079.

Before MIKVA and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This case concerns the regulatory regime for key pieces of radio equipment, called transponders, located on domestic communications satellites (domsats). A transponder picks up information broadcast to a satellite by a "transmit" earth station, amplifies it, and relays it back to any "receive" earth station tuned into that satellite. The domsats in the matter before us,

in the main, are or will be equipped with twenty-four operational transponders per satellite.[1] Domsat operators generally have leased transponders on a common carrier basis in accordance with the "just and reasonable" tariff strictures of the Communications Act. *See* Communications Act of 1934 tit. II, 47 U.S.C. §§ 201–224 (1976 & Supp. V 1981). In the orders on review, the Federal Communications Commission (FCC or Commission) authorized the sale of certain discrete transponders on a noncommon carrier basis. *Domestic Fixed-Satellite Transponder Sales*, 90 FCC2d 1238 (1982) (*Transponder Sales Order*).[2] The Commission's decision, we conclude, is within its statutory authority and is adequately reasoned; we therefore affirm the FCC's orders.

The Commission has made a modest adjustment. It has not displaced regulated common carrier service as the dominant mode for domsat operations.[3] It has agreed to entertain transponder sale applications on a case-by-case basis. Simultaneously, the FCC announced its intention to disallow sales should it "develop that ... additional transponders are required for users who need common carrier service[ ]." *Id.* at 1255.

Rapid technological advances, demand shifts, and changes in entrepreneurial judgments regarding satellite design and marketing have marked the period since 1974, when the first commercial domsat was orbited.[4] Appropriately, the FCC has not attempted to impose an inflexible regulatory regime on an industry "characterized by fluidity." *Id.* at 1247. Instead, the Commission has proceeded tentatively in an effort to develop sensible regulatory approaches responsive to the public interest. For this task, it has received no new instructions from Congress. Its sole guide from the legislature is the Communications Act, passed in 1934, decades before the advent of domsats.

■ We confront on review an arcane, fast-moving field of technology, opposing estimates of down the road supply and demand derived from currently available information, and no congressional action geared specifically to the new, burgeoning domsat industry. In these circumstances a reviewing court owes particular deference to the expert administrative agency's policy judgments and predictions, its forecasts of "the direction in which future public interest lies." *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 595 (1981) (quoting *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978)).

---

**1.** Each transponder, under current technology, can accommodate roughly 1200 simultaneous voice channels, 60 megabits of data per second, or a single color TV channel with audio. *Domestic Fixed-Satellite Transponder Sales*, 90 FCC2d 1238, 1239 n. 2 (1982).

**2.** The Commission concluded that the applications of three domsat operators to sell rather than lease a limited number of transponders were not subject to common carriage regulation and were in the public interest. The FCC therefore granted the applications. In a later order, also on review here, the Commission granted the similar application of a fourth domsat operator. *Southern Pacific Satellite Co.*, 92 FCC2d 666 (1982).

**3.** In a separate proceeding, the Commission relaxed the regulation of transponders leased on a common carrier basis. *Competitive Common Carrier Services*, FCC 83–481 (released Nov. 2, 1983). *See infra* note 9.

**4.** *See Western Union Telegraph Co.*, 46 FCC2d 162 (1974) (launch authorization for Western Union's Westar I satellite). Until 1981, only eight domestic communications satellites were in orbit. *Orbit Deployment Plan-Domestic Satellite*, 84 FCC2d 584, 587 (1981). The service life of this first generation of domsats will soon expire, but as of July 1, 1982, seven new domsats were in orbit, nineteen were authorized or pending authorization with 1982–1984 launch dates, and seven more were pending authorization with 1985–1987 launch dates. *Transponder Sales Order*, 90 FCC2d at 1262–65.

American Telephone and Telegraph Company (AT & T) has reported the following information on authorized satellites and transponders: for 1982, 4 carriers, 17 satellites, and 300 transponders; for 1984, 8 carriers, 26 satellites, and 594 transponders; and for 1987, 11 carriers, 38 satellites, and 918 transponders. *Competitive Common Carrier Services*, FCC 83–481 (released Nov. 2, 1983) at 18 n. 47.

We are persuaded by the record that the FCC, in authorizing a limited departure from the status quo, acted within its discretion. Petitioners assert that the Commission ruled outside its delegated authority and did not engage in reasoned decision-making; neither contention survives review faithful to our precedent. *See, e.g., Office of Communication of the United Church of Christ v. FCC*, 707 F.2d 1413 (D.C.Cir. 1983).

## I. BACKGROUND

The Commission first invited applications for commercial domestic satellite service in 1970. *Domestic Communication-Satellite Facilities*, 22 FCC2d 86 (1970) (*Domsat I*). At that time, the FCC recognized the potentially significant contribution domsats could make to the nation's communications system, *id.* at 89–90, but it had not yet determined basic issues—whether satellites should be special-purpose or multipurpose, whether they should be operated by a governmental corporation or by private industry. In soliciting concrete proposals, the Commission announced:

> [W]e will consider applications by all legally, technically, and financially qualified entities proposing the establishment and operation of domestic communications satellite systems .... Applicants may propose the rendition of such services directly to the public on a common carrier basis or by the lease of facilities to other common carriers, or any combination of such arrangements. Applicants may also propose private owner-

ship and use or the joint cooperative use of the system by the several owners thereof. Applicants may further propose the shared use of some facilities by different systems, or a division in the ownership of various system components (e.g., user ownership of earth stations to afford direct access to the space segment of a common carrier or cooperative system).

*Id.* at 93–94 (footnote omitted).

Two years later, the FCC settled on a policy under which legally, financially, and technically qualified private entities could receive domsat authorizations upon a showing that the proposed service would inure to the public benefit. *Domestic Communications-Satellite Facilities*, 35 FCC2d 844 (1972) (*Domsat II*). In stating the objectives of its regulatory policy,[5] the Commission underscored that it sought

> to retain leeway and flexibility ... [in] the use of satellite technology for domestic communications so as to make such adjustments therein as future experience and circumstances may dictate.

*Id.* at 847. The FCC did not rule definitively that all domestic satellite service must be offered under a regulated common carrier regime. In fact, however, the authorizations it issued for currently operating commercial domsats called for common carrier service—the leasing of transponders, generally on a first-come, first-served basis, *see* 47 U.S.C. §§ 201(a); 202, pursuant to

---

5. The Commission's policies in this area have been influenced by technological limits on the spacing of satellites using the same frequency. Communications satellites are geostationary, that is, they orbit the earth at exactly the same speed as the earth itself rotates, thus maintaining their position over a fixed point on the earth's surface. Only a portion of the orbital arc is visible from points within the United States, and thus usable to provide domestic satellite service. *See Domestic Fixed-Satellite Service*, 88 FCC2d 318, 320 (1981). The orbital arc, together with the associated frequency spectrum, remains a "limited natural resource," albeit one "which can be increased in value by wise use of technical means." *Id.* at 320, 321

(quoting Report to the Special Preparatory Meeting and to Study Group IV by CCIR Interim Working Party 4/1 on its Eighth Meeting, Tokyo, Japan, 29 May to 5 June 1978, at 3).

In addition, cost, risk, and market uncertainty created high access barriers to satellite ownership. *See United States v. FCC*, 652 F.2d 72, 100 (D.C.Cir.1980) (en banc); *Domestic Fixed Satellite Service*, 88 FCC2d 318, 321–22 (1981); *see also* Jonscher, Economic Implications of Satellite Transponder Sales (1982), at 8–14, *reprinted in* Joint Appendix (J.A.) 272, 281–87; Comment, *The Proposed Deregulation of Domestic Common Carrier Telecommunications*, 69 CALIF.L.REV. 455, 463 (1981).

"just and reasonable" cost-based tariffs. *Id.* §§ 201(b), 203.[6]

In 1979 the FCC proposed reduced domsat regulation; it saw the communications marketplace in which domsats figured as essentially competitive. *Competitive Carrier Rulemaking*, 77 FCC2d 308 (1979); *see Competitive Carrier Rulemaking*, 85 FCC2d 1, 26 (1980). In 1980, however, the Commission decided against any instant deregulatory step. *Competitive Carrier Rulemaking*, 85 FCC2d at 26–27. It observed that in recent months demand for transponder space had grown to exceed supply.[7] That situation might persist for the immediate future, the Commission conjectured, because of "technical limit[s] on the number of satellites that will be operating in the near term." *Id.* at 27. The FCC reached the decision to defer relaxed regulation with misgivings, and stated that it would engage in "continuing assessment." *Id.* at 11. It cautioned:

> [I]t is not clear that consumers are better off with rate regulation of the Domsats. If prices for transponder space are constrained, the market power is transferred to Domsat resale carriers. If, in turn, the prices of the resale carriers are constrained by regulation, it is likely that the windfall rents will be reaped by firms, such as cable systems and program suppliers, rather than the general populace. Under such conditions, the benefits of regulation are questionable.

*Id.* at 26.[8]

In 1981 the Commission again proposed relaxed rate regulation of domsats. *Competitive Carrier Rulemaking*, 84 FCC2d 445 (1981). It suggested that consumers were not the beneficiaries of the lower rates Commission regulation then required; that allowing market prices to rise would promote the development of satellite technology; and that technological innovation, when spurred by price allocation mechanisms, could provide ample opportunities for an increase in the supply of transponder capacity. The advantages of reduced regulation, the FCC forecast, would in the long run outweigh any detrimental impact of price increases in the short run. *Id.* at 507–08. The Commission had not taken final action on this proposal by the date the *Transponder Sales Order* issued.[9]

---

6. In *GTE Satellite Corp.*, 43 FCC2d 1141 (1973), the Commission did authorize a satellite cable distribution service "not ... in a common carrier mode." *Id.* at 1158. The FCC determined that other satellite operators would provide ample common carrier capacity for program distribution, and concluded that the proposal was "consistent with Commission policy that communications users should have available diverse means of meeting their varied and expanding communications requirements." *Id.* The authorized service, however, was similar in crucial respects to a common carrier undertaking, *see* 43 FCC2d at 1156; it was never put into operation. *See generally Network Project v. FCC*, 511 F.2d 786, 797 (D.C.Cir.1975).

The Commission has also authorized the provision of satellite service on a noncommon carrier basis to users who were themselves common carriers, *see, e.g., Western Union Telegraph Co.*, 86 FCC2d 196 (1981), and in special situations. *See, e.g., National Aeronautics and Space Admin.*, 61 FCC2d 56 (1976).

7. Industry planning had been severely unsettled by the loss of RCA's Satcom III satellite six days after its launch in December 1979; the resulting emergency contributed to a continuing supply shortfall. *See RCA American Communications, Inc.*, 84 FCC2d 918, 921 & n. 3 (1981).

8. We note that common carrier regulation, in practice, has not prevented dealers in the industry from reaping windfall profits. Satellite owners have been bound by tariff strictures in leasing transponders, but transponder leases, in turn, have become assets of tremendous value. Middlemen in the communications marketplace have charged what the market will bear for selling rights to transponder leases, sums enormously in excess of tariff-controlled cost-based rents. *See* Cooney, Lowering Skies for the Satellite Business, FORTUNE, December 13, 1982, at 148, 154, *reprinted in* J.A. 347, 350; *see also* Besen, An Economic Analysis of the Hughes Satellite Transponder Sale Proposal, at 3–11, *reprinted in* J.A. 136, 139–47; Jonscher, *supra* note 5, at 17–19, *reprinted in* J.A. 272, 290–92.

9. The Commission ultimately did relax domsat rate regulation in *Competitive Common Carrier Services*, FCC 83–481 (released Nov. 2, 1983). It found that "advances in satellite technology, regulatory decisions, and new entry have greatly expanded satellite supply," *id.* at 19 n. 48, and concluded that domsats do not possess sufficient market power to warrant the more stringent regulation.

## II. THE COMMISSION'S DECISION

In the *Transponder Sales Order*, the Commission authorized domestic satellite communications system licensees to make a limited part of their transmission capacity available to end users through sales of transponders on specific satellites. A transponder sale contract conveys to the purchaser an exclusive ownership right in a specific transponder during its useful life. The purchaser may use the property thus acquired as collateral for loans, and may enjoy certain tax benefits as a result of transponder ownership—notably, accelerated depreciation deductions and investment tax credits. The satellite owner, however, retains responsibility for the operation of the satellite. Sale transactions are not subject to the first-come, first-served allocation mechanism of common carrier service. Buyers negotiate the right to use specific transponders directly with the satellite operator, sometimes even before the satellite is launched. The price is set by contract and is not subject to government regulation.[10]

The Commission limited its authorization to the specific applications before it.[11] It permitted Hughes Communications, Inc. (Hughes) to sell all twenty-four transponders on its Galaxy I satellite,[12] RCA American Communications, Inc. (RCA Americom) to sell five of the twenty-four transponders on its Satcom IV satellite, and Western Union Telegraph Co. (Western Union) to sell a total of eleven transponders on two satellites. Both Hughes and RCA Americom have sold transponders only to cable programmers; Western Union has offered its transponders for the provision of other communications services.[13]

**10.** Both petitioners acknowledge that transponder sales are noncommon carrier offerings. *See* Brief for Petitioner/Appellant Satellite Syndicated Systems, Inc. at 25–26 ("[T]he DOMSATs' sales are the antithesis of common carrier offerings.... The significant ... issue before the Commission was whether transponder service may be provided in a non-common carrier fashion, when consideration is given to the scarcity of extremely valuable public spectrum."). *Accord* Reply Brief for Petitioner-Appellant Wold Communications, Inc. at 14–15. The crucial question this case posed for the Commission thus was not whether satellite operators engaging in transponder sales would be acting as common carriers; instead, the FCC's prime task was to determine whether authorization for the proposed noncommon carrier service promised sufficient public benefits to justify the assignment of scarce orbital locations and frequencies.

Intervenor MCI, however, contends that transponder sales fall under a common carrier activity rubric. Our precedent is to the contrary. Under *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C.Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 96 S.Ct. 2203 (1976) (*NARUC I*), what is "essential to the quasi-public character implicit in the common carrier concept is that the carrier 'undertakes to carry for all people indifferently ....'" (quoting *Semon v. Royal Indem. Co.*, 279 F.2d 737, 739 (5th Cir.1960)). The FCC, with adequate record support, found it unlikely that satellite operators engaging in transponder sales will hold themselves out indifferently to serve the user public. *Transponder Sales Order*, 90 FCC2d at 1257. MCI's focus on the satellite operators' lack of control over the content of transmissions is misplaced; in *NARUC I*, we determined that the operators of Specialized Mobile Radio Systems, who exercised no control over the content of the messages conveyed, were not common carriers. 525 F.2d at 642–45.

**11.** The applicants—Western Union Telegraph Company, Hughes Communications, Inc., and RCA American Communications, Inc.—had originally been licensed to provide services on the satellites in question on a common carrier basis. They subsequently informed the Commission of their intention to sell certain transponder ownership rights on those satellites on a noncommon carrier basis. The Commission then instituted the *Transponder Sales Order* proceedings to fulfill its "statutory obligation to determine whether the public interest would be served by certifying facilities for noncommon carrier services." *Transponder Sales Order*, 90 FCC2d at 1240.

**12.** Hughes has marketed these transponders according to a "shopping center" concept; it has selected only cable programmers as customers, choosing them with a view to the contribution they can make to augmenting the value of the satellite as a "cable bird." Each sales contract is negotiated individually.

**13.** In decisions of which we are aware issued since the *Transponder Sales Order*, the Commission authorized the sale of a total of fifty-seven additional transponders by Hughes, RCA Americom, Western Union, and Southern Pacific Satellite Co. (SPSC). As many as sixteen of those may be "wideband" transponders with roughly double capacity. Each authorization was grant-

In explaining its decision, the Commission first discussed the potential benefits of the proposed transactions.[14] Transponder sales, it found, would provide a means for would-be satellite operators to raise the capital needed to enter the market;[15] further, sales would provide a mechanism for gauging demand, and would facilitate risk sharing. Sellers would have an incentive to innovate by designing systems to fit particular users' needs. Buyers could plan ahead with the assurance that desired satellite capacity will be available to them at a set price when they need it. Sales transactions could be structured to meet the specific needs of particular satellite operators and end users; and satellite operators, through their selection of purchasers, could take advantage of complementarities among users.[16]

Supported by comments from the Federal Trade Commission and the Department of Justice, the FCC rejected arguments, based on supply scarcity assumptions or projections, made by opponents of transponder sales. Opponents argued that because "domsat facilities are currently scarce resources ... the domsat licensee will be able to obtain supranormal profits for its services." *Transponder Sales Order*, 90 FCC2d at 1244. They maintained that demand for satellite service would continue to exceed supply for the foreseeable future; that transponder sales would be ineffective in stimulating supply, in view of technical constraints on the number of satellites that could be launched; and that transponder sales would limit satellite service availability to those with "enormous financial resources." *Id.* at 1245. The Commission, however, noted that as of early 1981 it had authorized the construction of twenty-five new satellites and the launch of twenty new or previously constructed satellites;[17] and it forecast that new satellite construction would meet or exceed the anticipated transponder demand. Authorizations now in place, it found, would without more result in a quadrupling of domestic satellite capacity within the next five years. Technological developments could further boost transponder availability by reducing orbital spacing, opening up new frequency bands, and increasing transponder efficiency. The Commission referred to a then pending proposal to reduce orbital spacing; that proposal was in fact adopted,

ed only after a Commission finding that the authorization would not, on a percentage basis, significantly expand the noncommon carrier sector of the satellite market. *See Licensing of Space Stations in the Domestic Fixed-Satellite Service*, FCC 83–184 (released Aug. 16, 1983) at 40–42; *Southern Pacific Satellite Co.*, 92 FCC2d 666 (1982).

The Commission agreed to reconsider the August 1983 ten-transponder authorization to Western Union in response to allegations of Western Union's anticompetitive conduct. *See* Motion for Remand, *Wold Communications, Inc. v. FCC*, No. 83–1895 (D.C.Cir. filed by FCC Sept. 6, 1983), *granted* Sept. 22, 1983.

**14.** In support of its findings, the Commission cited studies indicating that transponder sales would promote efficient use of spectrum capacity and orbital space, stimulate technological innovation, and lower entry barriers in the satellite industry. *See* Besen, *supra* note 8; Jonscher, *supra* note 5. The studies acknowledged that transponder sales may allow a satellite owner to reap greater profits, but emphasized that those profits would provide the wherewithal for sys-

tem expansion and improvement. *See* Besen, *supra* note 8, at 8, *reprinted in* J.A. 136, 144; Jonscher, *supra* note 5, at 3, *reprinted in* J.A. 272, 276 ("[I]n the interest of avoiding purely speculative profit-taking and of rewarding the industry which is best positioned to develop the spectrum resource in the long run, available surplus profits are better assigned to the providers rather than to lessors of satellite systems."); *see also* Comments of Federal Trade Commission at 6, *reprinted in* J.A. 293, 296–A.

**15.** By selling transponders, a satellite operator may obtain cash through a variety of creative financing mechanisms, rather than spread out in lease payments. *Transponder Sales Order*, 90 FCC2d at 1252; *see* Jonscher, *supra* note 5, at 8–15, *reprinted in* J.A. 272, 281–88.

**16.** *Transponder Sales Order*, 90 FCC2d at 1251–52; *see* Besen, *supra* note 8, at 15–27, *reprinted in* J.A. 136, 151–64; *see also supra* note 12.

**17.** 90 FCC2d at 1250 (citing *Orbit Deployment Plan-Domestic Satellite*, 84 FCC2d 584, 585 (1981)).

with modifications, roughly a year after the *Transponder Sales Order* issued.[18]

The Commission pointed out that the long lead time between initial FCC authorization of a satellite and the satellite's actual commercial operation had contributed to a "lag" between the late 1970s "unexpected surge in demand for transponders and the construction and launch of new satellites sufficient to satisfy that demand." 90 FCC2d at 1250. It concluded, however, that the shortage (which had followed initial years in which "considerable operative capacity sat dormant") was temporary in view of construction underway. *See id.* at 1252–53.[19]

There was "no substance," the Commission said, to the prediction that its limited sales allowance would drastically curtail the number of transponders left for common carrier service. *Id.* at 1253. It was permitting a relatively small number of sales, *id.* at 1253–54; "the large majority of transponders should remain available on a common carrier basis." *Id.* at 1254. Small users, the FCC concluded, again in agreement with the Department of Justice and the Federal Trade Commission, would not be shut out of the transponder market; on the contrary, small users who could not afford straight monthly lease arrangements might be positioned to finance a transponder purchase aided by the associated tax benefits and the ability to pledge the

transponder as a tangible asset. *Id.* at 1254–55. Several small users supported the sales authorization, and cited this prospect in their comments. *See, e.g.,* Reply Comments of Vitalink Communications Corp. at 4–5, *reprinted in* J.A. 298, 301–02; Letter from Equatorial Communications to James R. Keegan, Chief, Domestic Facilities Division, Common Carrier Bureau, FCC (Feb. 19, 1982), *reprinted in* Comments of Western Union Telegraph Co. at 15, *reprinted in* J.A. 172, 177.

■ Finally, the Commission reiterated: "We will, of course, continue to scrutinize every application .... [A]dditional non-common carrier satellites will not be authorized if it should develop that their certification would not inure to the public interest (for example, if we find that additional transponders are required for users who need common carrier service.)." 90 FCC2d at 1255. In their separate statements, Commissioners Jones and Rivera underlined the importance they attributed to the Commission's case-by-case approach. *Id.* at 1279–80.[20]

### III. Discussion

It is the Federal Communications Commission's mission to facilitate development of "the new and far-reaching science of broadcasting" in harmony with the public interest. *See FCC v. Pottsville Broadcast-*

**18.** Licensing of Space Stations in the *Domestic Fixed-Satellite Service,* FCC 83–184 (released Aug. 16, 1983). *See infra* note 28.

**19.** Studies cited by sales opponents, the Commission observed, seriously underestimated transponder supply and capacity because they did not take into account "supply and technological advancement" subsequent to the studies' completion in 1979. *Transponder Sales Order,* 90 FCC2d at 1250 n. 28. The Commission relied instead on a later study, Darby, Analysis of the Short Term Satellite Video Distribution Market (1981). *Id.*

**20.** Petitioners Wold Communications, Inc. and Satellite Syndicated Systems, Inc., and intervenor MCI Telecommunications Corp., challenge the Commission's action. The FCC's suggestion, Brief for FCC and United States at 26 n. 29, that MCI is barred from intervening, is insubstantial. MCI's intervention in No. 82–2055, a petition for review pursuant to 47 U.S.C. § 402(a), is sup-

ported by 28 U.S.C. § 2348, which provides that *any* person "whose interests are affected by" the agency order may intervene in the proceeding for review. MCI's intervention in No. 82–2054, a direct appeal pursuant to 47 U.S.C. § 402(b), is similarly secure. 47 U.S.C. § 402(e) permits *any* "interested" person to intervene in a § 402(b) appeal. Section 405 of the Communications Act requires that a person not a party below file a petition for rehearing as a condition precedent to seeking judicial review. But nothing in the statute imposes a rehearing petition requirement on would-be intervenors, as distinguished from appellants. An intervenor, like an appellant, is precluded from raising issues upon which the Commission was not given an opportunity to pass. *See generally Action for Children's Television v. FCC,* 564 F.2d 458, 468–69 (D.C.Cir.1977). MCI's arguments, however, cannot fairly be so characterized.

*ing Co.,* 309 U.S. 134, 137, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940) (Radio Act of 1927). Congress established two regimes under which the Commission is empowered to "regulat[e] interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide, and worldwide wire and radio communication service with adequate facilities at reasonable charges." Communications Act of 1934, 47 U.S.C. § 151 (1976). First, in Title II of the Act, Congress provided for close FCC control over the service and charges of communications common carriers. *Id.* §§ 201–224 (1976 & Supp. V 1981). Second, in Title III, Congress provided for extensive licensing authority through which the FCC is to "maintain the control of the United States over all the channels of interstate and foreign radio transmission." *Id.* § 301.

In the orders under review, the Commission has authorized the provision of transponder service by satellite operators on a noncommon carrier basis—through sales on terms negotiated individually with selected purchasers. The authorization is not blanket. Each applicant must satisfy the Commission that the specifically described sales it proposes are in the public interest; the Commission, as part of its public interest analysis, has undertaken to determine whether sufficient common carrier transponder capacity will remain if the application is granted. *Transponder Sales Order,* 90 FCC2d at 1255. If sales authorization is approved, the affected transponders are removed from Title II regulation. The domsat operator, however, remains fully subject to the Commission's Title III authority. This court's task, in appraising the Commission's orders, is to decide first, whether the Commission's decision is within the broad range of the FCC's delegated authority under the Communications Act,

and if it is, whether the position the Commission has adopted is the product of a rational decisionmaking process. *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d 1413, 1422 (D.C. Cir.1983).

### A. Delegated Authority

As noted earlier, *see supra* note 10, both petitioners acknowledge that the transponder sales the Commission has authorized are noncommon carrier offerings. They maintain, however, that the Commission is obliged to fasten on domsat operators an exclusively common carrier regime and may not allow the marketplace to substitute for direct Commission regulation even where the FCC rationally finds that the public interest would be advanced thereby. *See* Brief for Petitioner/Appellant Satellite Syndicated Services, Inc. at 28–29 (SSS Brief); *see also* Brief for Petitioner-Appellant Wold Communications, Inc. at 26–27 (Wold Brief). This is unpersuasive argument.

From its initial venture in this area, the FCC contemplated the prospect of both common carrier and noncommon carrier operations. *Domsat I,* 22 FCC2d at 93.[21] For the first generation of domsats, the Commission generally provided for the offering of service on a common carrier basis. In line with the rapid growth and development of this new industry, the FCC has now made a moderate adjustment: (1) the Commission continues to exercise Title II common carrier regulatory authority with respect to the large majority of transponders; (2) it is exercising Title III authority to determine whether each proposed noncommon carrier transponder sale is in the public interest; (3) it has stated that a key concern in its public interest evaluation is the adequacy of the remaining common carrier capacity to serve users' needs; (4) it has recognized its obligation to monitor the

---

**21.** For other Commission determinations that the public interest would be served by the provision of communication facilities under private arrangements in addition to a common carrier regime, see, *e.g., Land Mobile Serv.,* 51 FCC2d 945 (1975), *aff'd, National Ass'n of Regulatory*

*Util. Comm'rs v. FCC,* 525 F.2d 630 (D.C.Cir.), *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976); *Allocation of Microwave Frequencies Above 890 Mc,* 27 FCC2d 359, 411–14 (1959).

results of the course it is pursuing, and to revise its position if changing circumstances so warrant. *Transponder Sales Order,* 90 FCC2d at 1255. This court is not positioned to "fault the Commission's policy determination that novel methods evincing the potential for greater efficiency ought to be tried." *Telocator Network of America v. FCC,* 691 F.2d 525, 542 (D.C.Cir.1982).

The drafters of the Communications Act had no vision of a domsat industry, but they designed the statute "to avoid the necessity of repetitive legislation," *Computer and Communications Industry Association v. FCC,* 693 F.2d 198, 213 (D.C. Cir.1982) (quoting *National Association of Theatre Owners v. FCC,* 420 F.2d 194, 199 (D.C.Cir.1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970)), *cert. denied,* —— U.S. ——, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983) (*Computer II*), by arming the Commission "with sufficiently elastic powers such that it could readily accommodate dynamic new developments in the field of communications." *Id.* (quoting *General Telephone Co. v. United States,* 449 F.2d 846, 853 (5th Cir.1971)). As this court recently observed: "Congress' clear intent in 1934 was to confer upon the Commission sweeping authority to regulate in 'a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding.'" *Office of Communication of the United Church of Christ v. FCC,* 707 F.2d at 1423 (quoting *National Broadcasting Co. v. United States,* 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943)).[22]

■■■ The FCC, charged with executing and enforcing the provisions of the Communications Act, may not abdicate its responsibility to perform those duties and insure that the Act's standards are met, *AT & T v. FCC,* 572 F.2d 17, 25 (2d Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978), nor does it have "unfettered discretion to regulate or not to regulate common carrier services." *Computer II,* 693 F.2d at 212. But the public interest touchstone of the Communications Act, beyond question, permits the FCC to allow the marketplace to substitute for direct Commission regulation in appropriate circumstances. *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981) (approving FCC reliance on market forces to promote diversity in entertainment programming). This court has several times so recognized. *See, e.g., Computer II,* 693 F.2d at 212 (citing with approval the holding of *Western Union Telegraph Co. v. FCC,* 674 F.2d 160 (2d Cir.1982), that "newly unleashed market forces" constituted a reasonable substitute regulatory tool); *National Association of Regulatory Utility Commissioners v. FCC,* 525 F.2d 630, 645 (D.C.Cir.), *cert. denied,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976); *see also Philadelphia Television Broadcasting Co. v. FCC,* 359 F.2d 282 (D.C.Cir.1966) (substituting Title III for Title II regulation is "rational and hence permissible"). The circumstances presented here do not render a role for market forces inappropriate.[23] The Commission, after making essential public interest determinations, has taken a measured step. It has allowed some space for private ordering. It has not forsworn regulation or slighted its obligation to forecast where the public interest lies; and it stands ready to alter its course if future developments indicate that the public interest is not advanced by its decision.

---

**22.** *See also Washington Utils. & Transp. Comm'n v. FCC,* 513 F.2d 1142 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975):

The Commission's authority is stated broadly to avoid the need for repeated congressional review and revision of the Commission's authority to meet the needs of a dynamic, rapidly changing industry. Regulatory practices and policies that will serve the "public interest" today may be quite different from those that were adequate to that purpose in 1910, 1927, or 1934, or that may further the public interest in the future.

*Id.* at 1157 (footnote and citation omitted).

**23.** *FPC v. Texaco,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974), is inapposite. In that case, the Court held that when Congress explicitly directs an agency to set the price of a commodity (there, natural gas), the agency cannot ignore its charge and leave the price to market forces. No comparable congressional direction governs this case.

Petitioners contend or predict that the FCC in fact will not review transponder sale applications with care to assure a sufficient remaining supply of common carrier transponders. *See* Wold Brief at 29–31; SSS Brief at 34–36; *see also* Brief for Intervenor MCI Communications Corp. at 8–9. But this court has no basis for concluding that the Commission is not proceeding, or does not intend to proceed, in the manner stated in the principal decision on review. The Commission has emphasized its commitment to scrutinize each request for noncommon carrier transponder offerings to ensure the application's consistency with the public interest. *Transponder Sales Order*, 90 FCC2d at 1255.[24] It reaffirmed its transponder-by-transponder authorization policy in *Western Union Telegraph Co.*, FCC 83–54 (released Feb. 9, 1983), *reprinted in* Brief for FCC and United States at B–1, and has stated guiding reasons for its approval of transponder sales applications. *See Licensing Space Stations in the Domestic-Fixed Satellite Service*, FCC 83–184 (released Aug. 16, 1983) at 40–42 (effect of granting the application on relative size of noncommon carrier portion of satellite services market); *Southern Pacific Satellite Co.*, 92 FCC2d 666 (1982) (percentage of satellite's authorized in-orbit capacity proposed to be made available on a noncommon carrier basis, and effect of granting the application on relative size of noncommon carrier portion of satellite services market). The Commission has not stated a precise bright-line test, perhaps reflecting its concern that a simple comparison of the percentage of common carrier transponders with the percentage of noncommon carrier transponders may not in every case satisfy the Commission's obligation to determine whether transponder sales certification is in the public interest. We expect that the Commission will in all cases seriously examine transponder sales applications in light of all factors relevant to the public interest calculus, and will monitor the results of the course it is pursuing.

### B. *Rational Decisionmaking*

■ In determining whether the Commission reached its decision rationally, not arbitrarily or capriciously, this court's office is limited. We review the record to determine whether "the Commission has adequately explained the facts and policy concerns it relied on," whether "those facts have some basis in the record," and whether a reasonable person, considering the matter on the agency's table, could arrive at the judgment the agency made. *Telocator Network of America v. FCC*, 691 F.2d 525, 537 (D.C.Cir.1982) (quoting *NAACP v. FCC*, 682 F.2d 993, 998 (D.C.Cir.1982)).

Petitioner Satellite Syndicated Systems, Inc. (SSS) asserts that "transponder sales are a radical departure from the existing policy and [therefore] the Commission must provide compelling justification for the change." SSS Brief at 10. This exaggerates both fact and law. The FCC recognized at the outset that, although it had issued space station authorizations before "not in the traditional common carrier mold," transponder sales did "represent a significant departure from the manner in which satellite service has generally been provided." *Transponder Sales Order*, 90 FCC2d at 1247, 1248. "This is [therefore] not a case where an agency altered course without acknowledging or recognizing the change." *Black Citizens for a Fair Media v. FCC*, 719 F.2d 407, 417 (D.C.Cir.1983). The Commission knew what it was doing and presented at length reasoned justification for its decision. *See supra* pp. 7–13.

---

**24.** [A]pplicants should not fail to include information as to (1) the proposed disposition of all satellite transponders, particularly as to whether common carriage or noncommon carriage, (2) if transponders are to be made available to other parties, the nature of such offerings (e.g. pursuant to ownership contracts, long or short term leases, etc.) and the principal terms of the offerings (e.g., owner-

ship rights, warranty obligations, length of the contract, etc.), (3) marketing plans so that the *NARUC I* test can be applied, and (4) the number of transponders and the name of the purchasing customer for which sale contracts, if any, have been executed. Such information is necessary to make the requisite public interest determinations.
*Transponder Sales Order*, 90 FCC2d at 1260.

A court cannot demand more if it is to respect the "broad discretion" Congress vested in the Commission "precisely to facilitate ... modifications of administrative policies in light of developments" in an evolving industry. *Office of Communications of the United Church of Christ v. FCC*, 707 F.2d at 1425.

Petitioners further attempt to squeeze this case into the mold of *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), by asserting that the Commission failed to examine "alternatives." Apart from the status quo, however, the petitioners fail to state sensibly what else the Commission should have considered. Nor is there evidence in the record that "alternatives" other than "no change" were suggested to the Commission. *State Farm* is therefore inapposite to the situation presented here.

■ The Commission's analysis of supply and demand is criticized heatedly by petitioners,[25] but we find adequate support for it in the record. As earlier observed, *see supra* note 19, petitioners prefer the dated studies they cited[26] to the more recent one credited by the Commission. It is not our role to second guess the FCC's plausible evaluation of these submissions. *See National Broadcasting Co. v. United States*, 319 U.S. 190, 224, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943).[27]

It is true that the FCC's discussion focuses less intensively on projected transponder *demand* than it does on transponder *supply*. The Commission, however, did not entirely neglect demand analysis. *See Transponder Sales Order*, 90 FCC2d at 1250 n. 28. Moreover, even if we accept petitioners' estimates of short-term demand, it appears that the supply of transponders will match that demand in the current decade. *Compare id.* at 1275 (Fogarty, Commissioner, dissenting) (projections of transponder demand), *with id.* at 1262–65 (opinion of the Commission) (expected transponder supply).

Petitioners fault the Commission for unduly emphasizing the future over the here and now; they charge that the FCC "fail[ed] to take note that the long lead planning time involved would indicate that satellites *under construction* now are of no use to customers who desire *service now.*" SSS Brief at 7 (emphasis in original); *see also* Wold Brief at 17. This argument does not warrant overturning the Commission's decision. Petitioners them-

---

**25.** *See* SSS Brief at 11, 18; Wold Brief at 17, 18–23.

**26.** The Commission found that the studies petitioners cited overprojected the number of transponders needed by underprojecting the capacity of individual transponders and satellites. *See Transponder Sales Order*, 90 FCC2d at 1250 n. 28; *see also Competitive Common Carrier Rulemaking*, FCC 83–481 (released Nov. 2, 1983), at 19 n. 49.

**27.** Petitioners indict the Commission's conclusions about supply and demand as inconsistent with the FCC's characterization of domestic satellite operators as "dominant" in *Competitive Carrier Rulemaking*, 85 FCC2d 1 (1980). In that ruling, however, the FCC anticipated "continuing assessment." *See supra* p. 6. The *Transponder Sales Order* is consistent with the Commission's representation that the matter would remain under review. *See Western Union Telegraph Co. v. FCC*, 674 F.2d 160, 164–65 (2d Cir.1982) (elimination of specific regulatory control not "unexplained departure" from earlier decision maintaining it where prior decision had found that control was economically inefficient but necessary under then-existing conditions). Petitioners' apparent argument that the Commission was locked into the status quo while the "dominant" label remained in place, *see* Wold Brief at 23; SSS Brief at 39–42, is unpersuasive. The Commission is not obliged to forgo a measured change and await a day uncertain when conditions justify a broader departure from a prior ruling. *See Transponder Sales Order*, 90 FCC2d at 1254 & n. 38 (Commission need not decide "whether the common carrier operations of domsats should be streamlined or deregulated" in order to conclude, in agreement with the Department of Justice and the Federal Trade Commission, that domsat licensees "do not possess the significant market power required to impair the reasonable availability of transponder supply.").

In fact, the Commission did classify domsats as nondominant just over a year after the *Transponder Sales Order* issued. *Competitive Common Carrier Services*, FCC 83–481 (released Nov. 2, 1983). *See supra* note 9.

selves neglect to note that the majority of transponders whose sales the *Transponder Sales Order* authorized were ón a satellite then "under construction," and thus were unrelated to "service now." Further, the Commission was well aware of "a three to five year lead time before [satellite systems can] become operational." *Transponder Sales Order*, 90 FCC2d at 1250. Its opinion does not discuss at length immediate short-term impacts. Even in the short term, however, the Commission saw no danger that transponder sales would "drastically curtail the availability of transponders left for common carrier use." *Id.* at 1253. Reading the Commission's opinion as a whole, we find sufficient indication that the agency adequately considered short-term impacts and rationally concluded that the difficulties any moderate short-term dislocation presented would be outweighed by the long-term benefits of its authorizations. *See id.* at 1251–55.

**28.** The Commission mentioned in its decision that the number of available orbital locations might be increased by 50% to 100% through reduced orbital spacing, a matter then pending before it. The orbital spacing proceeding concluded about a year later. It increased orbital locations by 50% in the 12/14 GHz band and by 50% to 100%, with an ultimate increase of 100%, in the 4/6 GHz band. Licensing of Space Stations in the *Domestic Fixed-Satellite Service*, FCC 83–184 (Aug. 16, 1983). Petitioners describe the Commission's reference in the *Transponder Sales Order* to the then pending orbital spacing proceeding as "prejudg[ment]." SSS Brief at 11. In some circumstances such a Commission reference would be troubling. For example, we would hesitate to sanction an agency's announcement of, and reliance on, the result of a pending proceeding where the notice-and-comment docket in that proceeding had not yet closed. *Cf. Action on Smoking and Health v. CAB*, 699 F.2d 1209, 1216 (D.C.Cir.1983) (agency in rule-making proceeding must "resolve[ ] any significant problems raised by the comments, and ... show how that resolution led [it] to the ultimate rule") (quoting *Rodway v. United States Dep't of Agriculture*, 514 F.2d 809, 817 (D.C.Cir. 1975)). We find, however, no large cause for concern in the Commission's reference to the orbital spacing docket. The Commission did not dispositively rely on the orbital spacing proposal in formulating its rationale. The deadline for submission of reply comments in the orbital spacing proceeding had passed; that proceeding has concluded without substantial dissent or

Petitioners see caprice in the Commission's view that there is a benefit to the public in the risk sharing and flexible financing transponder sales permit. This incentive is not needed, petitioners urge, for despite the absence of transponder sales in the past, applications for authorization to construct and launch satellites have exceeded available orbital slots. *See* SSS Brief at 8–9; Wold Brief at 21–23. The FCC, however, took into account technological developments promising "substantial opportunities for expansion of satellite services and additional market entry," as well as prospects for increasing the orbital positions available for new satellites.[28] *Transponder Sales Order*, 90 FCC2d at 1254. Petitioners call the FCC's discussion "speculation." But the FCC's forecasts have support in the record;[29] they are judgments of the very sort the Commission must make if it is to avoid governing tomorrow by standards shaped for yesterday. As the Supreme Court instructed this court:

petition for review, significantly expanding the number of orbital locations.

Commissioner Fogarty, dissenting from the *Transponder Sales Order*, disagreed with the Commission's position as to the efficacy of reduced orbital spacing, but he did not share the petitioners' view that the Commission should not have thought about reduced orbital spacing when it decided what to do about transponder sales. *See Transponder Sales Order*, 90 FCC2d at 1273–74 (Fogarty, Commissioner, dissenting). Indeed, he found it "not unduly optimistic" to predict that "a reduction in spacing to 2.5 or 3 degrees will ultimately be adopted." *Id.* at 1274.

**29.** *See, e.g.,* Jonscher, *supra* note 5, at 6, *reprinted in* J.A. 270 (technological development in the Ku and higher frequency bands). The Commission had recognized development prospects in earlier proceedings. *See Domestic Fixed Satellite Service*, 88 FCC2d 318, 334–36 (1981); *Orbit Deployment Plan-Domestic Satellite*, 84 FCC2d 584, 593–96, 606–08 (1981); *Deregulation of Telecommunications Servs.*, 84 FCC2d 445, 507–08 (1981). Subsequent events have borne out a number of the Commission's predictions regarding new satellite technologies. *See* Satellite Week, Dec. 13, 1982, at 2 (single-sideband analog compression technique), *discussed in* Brief for Intervenors GTE Satellite Corp. *et al.* at 26; *id.* Nov. 4, 1982, at 4–5 (new technology doubling transponder TV capacity), *discussed in* Brief for Intervenors Home Box Office *et al.* at 25.

[T]he Commission's decisions must sometimes rest on judgment and prediction rather than pure factual determinations. In such cases complete factual support for the Commission's ultimate conclusions is not required since "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency."

*FCC v. WNCN Listeners Guild,* 450 U.S. 582, 594–95, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521 (1981) (quoting *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 814 (1978)); *see also Office of Communication of the United Church of Christ v. FCC,* 707 F.2d at 1435, 1437.[30]

Finally, we see no merit in petitioners' claim that the Commission neglected the problems of small cable systems. In addressing the impact of its action on small users, *Transponder Sales Order,* 90 FCC2d at 1254–55, the FCC was guided by the comments of small and medium-sized users *favoring* transponder sales. *See, e.g.,* Comments of Turner Broadcasting System, *reprinted in* J.A. 73–76 (medium-sized user with nationwide viewing audience). No small or medium-sized cable programmer appears in this court to complain about the Commission's decision; two—Spanish International Network and Turner Broadcasting System—appear in support of the Commission's decision.

CONCLUSION

 Petitioners, in much of their argument, tell the court in many words that the FCC's decision is in their view "unwise, ... not likely to succeed in accomplishing what the Commission intended." *National Broadcasting Co. v. United States,* 319 U.S. 190, 224, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943). The only response a reviewing court, mindful of its limited role, should give to arguments thus forecasting failure

of the agency's design is that the complainants "have selected the wrong forum for such a plea." *Id.*[31]

 The Commission's effort to serve the public interest in the matter at hand is adequately reasoned and within the broad charter Congress gave it. The orders on review are therefore

*Affirmed.*

---

**30.** Moreover, the Commission reasoned that risk sharing and flexible financing will facilitate the entry of new, smaller satellite operators. *Transponder Sales Order,* 90 FCC2d at 1252.

**31.** *See Telocator Network of America,* 691 F.2d at 542 ("To insist on concrete proof that a proposed innovation will succeed without undesirable side effects would be effectively to relegate the Commission to preserving the status quo.").